COPY

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Marc I. Gross
Jeremy A. Lieberman
POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Patrick V. Dahlstrom
POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Co-Lead Counsel for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT
SEP 17 2012
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATED DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE CHINACAST EDUCATION, CORP. SECURITIES LITIGATION** | Case No. CV 12-4621-JFW (PLAx)<br><br>CONSOLIDATED CLASS ACTION COMPLAINT<br><br>**<u>JURY TRIAL DEMANDED</u>** |

1. Lead Plaintiffs Costa Brava Partnership III LP ("Costa Brava") and Jayhawk Private Equity Fund II, L.P. ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ChinaCast Education Corporation ("CAST" or the "Company"), securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, investigation of Chinese State Administration of Industry and Commerce filings, and review and analysis of PRC news reports. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of CAST between February 14, 2011 and April 2, 2012 inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2. CAST is a post-secondary education and e-Learning services provider in China. The Company purports to provide post-secondary degree and diploma programs through its three universities in China: the Foreign Trade and Business College of Chongqing Normal University ("FTBC"), the Lijiang College

of Guangxi Normal University ("Lijiang") and the Hubei Industrial University Business College ("HIUBC"). The Company's E-learning and Training Service Group ("ELG") provides services such as interactive distance learning applications, multimedia education content delivery, and vocational training courses. The Company is listed on the NASDAQ Global Select Market with the ticker symbol CAST.

3. During the Class Period Defendants fraudulently misrepresented the Company's true financial condition.

4. CAST failed to disclose material related party transfers of no less than $120 million in cash during June 2011 to April 2012 from the Company to CAST Chairman and CEO Ron Chan Tze Ngon ("Chan") and other Company insiders including President of China Operations, Jiang Xiangyuan (collectively "Chan and Affiliates"), for their personal financial gain.

5. As CAST would later admit, the undisclosed material related party transactions were "readily identifiable" "significant inflows and outflows of cash involving family members, friends and related companies" that occurred "almost daily." The "transfers appear to be unconnected and inconsistent with the Company's historical revenue collection cycle and normal expenditures for operations."

6. CAST's Board of Directors told investors that they took personal responsibility for overseeing related party transactions. Indeed, on a March 17, 2011 conference call, Defendant Sena specifically reassured investors that "non-recurring, irregular" contracts would be vetted by the Board of Directors.

7. Stated differently, the transfers of $120 million of cash from CAST to Chan and Affiliates in the form of non-recurring, irregular contracts were made in plain sight, even though CAST's Board of Directors took personal responsibility for vetting such transactions. .

8. These undisclosed transfers of cash to Chan and Affiliates rendered the Company's financial statements filed with the SEC materially false and misleading on two independent grounds, (a) the financial statements misstated the Company's true cash and asset balances; and (b) the failure to disclose material related party transactions rendered CAST's financial statements materially false and misleading under Generally Accepted Accounting Principles ("GAAP") and SEC regulations.

9. CAST also issued knowingly false statements to investors that it maintained adequate internal control over financial reporting. While CAST was on notice of two internal control deficiencies, Defendants failed to disclose the systemic internal control deficiencies concerning CAST's ownership of its subsidiaries, control of bank accounts, undisclosed related party transactions, and outright theft of Company assets.

10. In addition to Chan's $120 million transfer of cash for personal gain, the undisclosed internal control deficiencies: (a) permitted a CAST Vice President to misappropriate Company assets and engage in loan fraud from 2009 to 2012; (b) permitted the same Vice President to transfer over $5.6 million of Company funds to his son; (c) permitted Chan and Affiliates to unlawfully transfer control of two of CAST's private colleges, Liajiang and HIUBC, outside of the Company; and (c) permitted undisclosed loans to third parties secured by Company assets, including a $37 million pledge of Company funds to secure a loan to parties unrelated to the Company.

11. While CAST's officers were engaging in these self-dealing transactions, CAST was issuing numerous false reassurances to investors and analysts in conference calls and public statements that its cash balances and financial statements were truthful and accurate.

12. As the market slowly learned of this adverse information through partial disclosures, CAST's stock price dropped, eventually losing nearly all of its value as a result of defendants' fraud.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

15. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

16. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17. Lead Plaintiffs, as set forth in certifications already filed with this Court, incorporated by reference herein, purchased CAST securities at artificially inflated prices during the Class Period and have been damaged thereby.

18. Defendant CAST is a Delaware corporation headquartered in Hong Kong. During the Class Period, CAST's common stock was listed on the NASDAQ under the ticker "CAST."

19. Defendant Ron Chan Tze Ngon ("Chan") was the Company's Chief Executive Officer ("CEO") and Chairman of the Board from 1999 until March 26, 2012. He is the founder of the Company.

20. Defendant Antonio Sena ("Sena") served as Chief Financial Officer ("CFO") of CAST from 2007 until March 27, 2012.

21. Defendant Michael Santos ("Santos") served as a member of the Board, President of International, and Executive Director from 2009 until his resignation from the Board on March 19, 2012. According to the Company's November 2011 proxy statement, Santos had "overall responsibility for all international operations." Santos originally joined the Company in 2001 and served as Chief Marketing Officer from 2001 to 2009.

22. Defendant Justin Tang ("Tang") served as a member of the Board and the Audit Committee from 2007 until January 17, 2012.

23. Defendant Daniel Tseung ("Tseung") served as a member of the Board from 2007 to present. Tseung was also the Chairman of the Audit Committee from CAST from 2007 to present.

24. Defendant Ned Sherwood ("Sherwood") served as a member of the Board from 2009 to present. Sherwood served on the Audit Committee from 2009 through September 25, 2011. Sherwood was reinstated to the Audit Committee on January 29, 2012 and has continued to serve on the Audit Committee since that time. Sherwood served as the "audit committee financial expert" from the beginning of the Class Period through September 25, 2011. He was also designated the "audit committee financial expert" on January 29, 2012. Sherwood was initially appointed to the Board as a designee of Fir Tree Inc. ("Fir Tree") pursuant to a letter agreement, dated June 27, 2008. During the Class Period, Fir Tree owned 13.2% of CAST's outstanding shares. During the Class period, Sherwood, beneficially owned 7% of CAST's outstanding shares through ZS EDU LP, and other investment entities he owns or controls.

25. Defendant Stephen Markscheid ("Markscheid") has served as a member of the Board from October 3, 2011 to present. Markscheid also served as a member of the Audit Committee from October 3, 2011 until January 29, 2012.

During that time, Markscheid also served as the "audit committee financial expert." According to ChinaCast's website (last checked September 17, 2012), Markscheid is currently a member of the Company's Audit Committee. He is also a director of other notorious Chinese listed frauds. He is a director of China Integrated Energy, Inc.—a Chinese fraud that has resulted in a stock delisting and an SEC investigation. Markscheid is also a Director of JinkoSolar—a Chinese company accused of issuing material misstatements to U.S. investors.

26. Defendant Derek Feng ("Feng") served as a member of the Board from January 17, 2012 to present. Feng has also served as Chairman and interim Chief Executive Officer from March 26, 2012 to present.

27. Chan, Sena, Santos, Tang, Tseung, Sherwood, Markscheid, and Feng, are collectively referred to hereinafter as the "Individual Defendants."

## I. Defendants' Fail to Disclose Material Related Party Transactions

28. In each of CAST's financial statements filed on Forms 10-Q and 10-K and the Proxy Statement filed with the SEC during the Class Period, Defendants knowingly or in a deliberately reckless manner failed to disclose material related party transactions concerning defendant Chan and his related entities, that rendered such SEC filings materially false and misleading.

### A. Undisclosed Transfers of at least $120 million in Cash to Chan and His Affiliates

29. On May 14, 2012, CAST announced for the first time that beginning in at least June 2011 and continuing through April 2012 CAST, had transferred more than RMB 760 million (approximately $120 million) in cash to Chan and his related entities. The announcement also warned that there may have been additional previously undisclosed transfers from CAST's other bank accounts and that CAST's investigation was ongoing.

30. On July 30, 2012, CAST provided further details about its undisclosed transfers to Chan and His Affiliates. The announcement revealed: (a)

the transfers were accomplished through undisclosed inflows and outflows of cash from CAST to Chan and Affiliates; (b) these inflows and outflows of cash occurred between June 2011 and April 2012; and (c) the inflows and outflows of cash were "readily identifiable," occurred "almost daily," each involved "significant inflows and outflows of cash," and were unconnected and inconsistent with CAST's revenue collection and expenditure operations. Stated differently, these undisclosed related party inflows and outflows of cash were obvious, and on their face, improper. The July 30, 2012 8-K states in relevant part:

> ***Embezzlement of Funds by Prior Management***. As previously disclosed in the Company's Form 8-K dated May 14, 2012, the Company learned that approximately US$120 million in cash was withdrawn from bank accounts of the Company's Shanghai-based subsidiaries, namely Yupei Training Information Technology (Shanghai) Ltd. ("Yupei") and ChinaCast Technology (Shanghai) Limited ("CCT SH"), over a period of time beginning in July 2011, and greatly accelerating in November 2011, through unauthorized transfers directed by Prior Management. Also as previously disclosed in the Company's Form 8-K dated June 12, 2012, upon regaining possession of the replacement business licenses and chops necessary to take certain actions for Yupei and CCT SH, the Company gained full access to the bank statements of Yupei and CCT SH and began an audit of these accounts.
>
> The Company recently hired a Shanghai-based forensic accounting firm to assist with the audit. Our findings to date, which have been based on reviews of the bank statements over an initial review period from June 2011 to April 2012 (the "Initial Review Period") and other evidence, have revealed a series of frequent (almost daily), readily identifiable and significant inflows and outflows of cash involving family members, friends and related companies of Prior Management and other unrelated companies. Such transfers appear to be unconnected and inconsistent with the Company's historical revenue collection cycle and normal expenditures for operations. While it is too early to conclude the exact nature and purpose of such inflows and outflows of cash from these bank accounts, the Company believes that these transfers were done at the direction of Prior Management without authorization from the Company's board of directors and for improper purposes.

**B. CAST Was Duty Bound to Disclose The Material Omitted Information**

31. The related party transactions between CAST and Chan and other CAST management, were material information CAST was required to disclose to investors in each of its annual and quarterly reports and proxy statements issued during the Class Period. The failure to disclose the related party transactions rendered the Company's Class Period filings false and misleading.

32. Defendants' falsely represented that CAST's Class Period financial statements complied with GAAP and SEC regulations.

33. GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

34. GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

35. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

36. SEC and NASDAQ rules and regulations require that publicly traded companies such as CAST include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

37. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

38. Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

39. GAAP Statement of Financial Accounting Standards ("SFAS") and SEC Regulation S-K required the Company to disclose all material related party transactions. CAST did not do so.

40. SFAS No. 57 provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2.

41. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b).

42. Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income

statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2.

43. SEC Regulation S-K ("Reg. S-K") (together with the General Rules and Regulations under the Securities Act of 1933 ["Securities Act"] and the Exchange Act and the forms under these Acts) states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on from 14A. (*See* Reg. S-K, §229.10).

44. Reg. S-K at Section 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

45. Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

46. Reg. S-K Section 229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1) through (5).

47. A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

48. The undisclosed transfers from CAST to Chan and His Affiliates described above are material related party transactions under GAAP and SEC rules. Because CAST failed to disclose the material related party transactions described above in each financial statement filed with the SEC, each financial violated GAAP and hence, each is materially false and misleading.

**C. Chan and Sena Lie to the Company's Auditors About the Existence of the Material Related Party Transactions**

49. As part of each annual audit, under Generally Accepted Auditing Standards AU Sections 333 and 334, the Company's auditor is obligated to inquire, either orally or in writing, of each senior officer and each director as to the existence of any related party transactions with the Company.

50. As part of each annual audit, under Generally Accepted Auditing Standard AU 560, the Company's auditor is obligated to inquire of management whether the corporation has entered into any material transactions that must be listed as subsequent events in the financial statements pursuant to GAAP and SEC regulations.

51. In addition, prior to issuing an audit opinion, an auditor will require that a Company's Chief Executive Officer and its Chief Financial officer sign a "management representation letter." These written representations are mandated as a professional standards requirement under the Statements on Auditing Standards No. 85 ("SAS 85").

52. Under SAS 85, a public company's independent auditors are required to obtain written representations from a company's senior management, normally the chief executive, as part of the audit process. (See also AU Section 333.06).

53. These representations are contained in what is known in auditing jargon as a "management representation letter." The management representation letter should cover all periods covered by the auditor's report. Management representation letters are used to provide information to the auditors about matters

that cannot be objectively tested because they depend on management's knowledge, such as management's intentions and the completeness of information provided to the auditor. A copy of a standard management representation letter is attached as Exhibit 1 hereto and incorporated herein by reference.

54. The management representation letter inquires of management whether there are any related party transactions or material subsequent events that must be disclosed in the financial statements *as of the date of the auditors' report*.

55. The management representation letter required defendants Chan and Sena to each individually represent to the Company's independent auditors in connection with the Company's annual report and amended annual report, among other things:

a. He or she has disclosed all related party transactions to the auditors and that he was not aware of any other related party transactions required to be disclosed in the financial statements.

b. All the related party transactions undertaken have been properly reflected and recorded in the accounting records.

c. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

d. All guarantees under which the company is contingently liable have been properly recorded or disclosed in the financial statements

e. The financial statements are fairly presented in conformance with GAAP.

f. They have no knowledge of any fraud or any suspicion of fraud affecting the issuer, involving management, employees who have a significant roles in internal control, whether or not the fraud has a material impact on financial statements, or others where the fraud could have a material effect on the financial statements.

56. The last paragraph of the management representation letter required the CEO and the CFO to state: "To the best of our knowledge and belief, no events have occurred subsequent to the balance-sheet date of this letter that would require adjustment to or disclosure in the aforementioned financial statements."

57. The management representation letter thus required CEO Chan and CFO Sena to disclose to Company's auditor, Deloitte Touche Tohmatsu CPA Ltd ("Deloitte"), the details of all of the related party transaction as of March 16, 2011, September 2, 2011, February 7, 2012 and February 24, 2012—the dates of the audit opinions issued in connection with CAST 2010 financial statements and amendments thereto.

58. CAST's auditors required Chan and Sena to execute and provide to them similar management representation letters in connection with the Company's quarterly reports filed during the Class Period pursuant to Statement on Standards for Accounting and Review Services ("SSARS"), 9 *Omnibus Statements on Standards for Accounting Review Services.*

59. CAST's would not, and could not, consistent with generally accepted auditing standards, sign off on, certify, or approve CAST's financial statements unless CAST's CEO Chan and its CFO Sena signed and provided to them the aforementioned management representation letters.

60. A sample Management Representation letter under SSARS published by *The CPA Journal*, (April 2004) is attached hereto as Exhibit 2. Chan and Sena submitted similar Management Representation letter to Deloitte in connection with each of the following quarterly reports:

a. 10-Q for the first quarter ended March 31, 2011, filed with the SEC on May 10, 2011;

b. 10-Q for the second quarter ended August 9, 2011, filed with the SEC on August 9, 2011; and

c. 10-Q for the third quarter ended September 20, 2011, field with the SEC on November 9, 2011.

61. Chan and Sena must have signed knowingly false management representation letters to CAST's auditors, otherwise the auditors would have learned of and disclosed the related party, and required the CAST to disclose them in each of CAST's annual and quarterly reports, and Proxy statements.

## II. CAST's Board Turns a Blind Eye To Material Internal Control Weaknesses and the Material Related Party Transactions; CAST Misstates The Company's Internal Controls

62. Deloitte warned the Board that serious internal control weaknesses existed, but the Board turned a blind eye. On March 16, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC (the "2010 10-K"), which disclosed that Deloitte, the independent registered public accounting firm that audited the Company's consolidated financial statements, reached the following conclusions regarding CAST's internal controls:

> We and our independent registered public accounting firm, in connection with the audit of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act for the fiscal year ended December 31, 2010, have identified the following material weaknesses in our internal control over financial reporting:
>
> - Lack of sufficient skilled resources in the finance team to meet the demands of rapidly expanded businesses which resulted in a delayed closing process
> - Lack of contemporaneous documentation of certain decisions made by the Board of Directors
>
> A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***We have taken measures and plan to continue to take measures to remedy these deficiencies.***

> However, the implementation of these measures may not fully address the control deficiencies in our internal control over financial reporting.

63. At the same time, CAST variously stated in its SEC filings that the Board and Audit Committee were responsible for reviewing and approving related party transactions. The same 10-K states that "[i]t is the Company's policy that the Company will not enter into any related party transactions unless the Audit Committee or another independent body of the Board of Directors first reviews and approves the transactions."

64. Additionally, the 10-K represented that CAST's Audit Committee, comprised of Defendants Sherwood, Tang, Tseung, and Markscheid were responsible for the following:

> The function of the Audit Committee is to provide assistance to the Board of Directors in fulfilling its oversight responsibility to stockholders, potential stockholders, the investment community and others relating to:
> • the integrity of the Company's financial statements;
> • the financial reporting process;
> • the systems of internal accounting and financial controls;
> • the performance of the Company's internal audit function and independent auditors;
> • the independent auditors' qualifications and independence; and
> • the Company's compliance with ethics policies and legal and regulatory requirements.

65. Despite the clear warning from Deloitte regarding the Company's weak internal controls and the Board and Audit Committee's express duty to review related party transactions, the Audit Committee and the rest of the Company's Board either knowingly or in a deliberately reckless manner turned a blind eye, allowing Defendant Chan and Affiliates to steal two of the Company's private colleges, and at least $120 million from the Company's coffers through

undisclosed material related party transactions between at least June 2011 through April 2012.

66. As noted above, the undisclosed material related party transactions were "readily identifiable" and involved “almost daily” “significant inflows and outflows of cash” involving Chan, that were unconnected and inconsistent with CAST’s revenue collection and expenditure operations.

### A. CAST Misstates the True State of the Company’s Internal Controls

67. CAST’s admission of two internal control deficiencies in the 2010 10-K and the reassurance that “***We have taken measures and plan to continue to take measures to remedy these deficiencies”*** were materially false and misleading. Substantially similar statements were made in CAST’s amendments to the 2010 10-K filed with the SEC on September 2, 2011, February 8, 2012, and February 24, 2012.

68. CAST’s quarterly reports filed during the Class Period (Q1 2011, filed on May 10, 2011, Q2 2011 filed on August 9, 2011, and Q 3 2011 filed on November 9, 2011), also falsely represented that Defendants were working to cure the internal control deficiencies.

69. The reality was that the Company had systemic material internal control weaknesses that directly impacted its ownership of its subsidiaries, control of bank accounts, and related party transactions.

<u>The Unauthorized Transfer of CAST Subsidiaries</u>

70. In addition to the undisclosed material related party transactions set forth above, the Company’s derelict internal controls permitted the unauthorized transfer of CAST's subsidiaries which held CAST's interests in two of the Company’s colleges, HIUBC and Lijiang College, to unauthorized persons outside of the Company group structure on March 7, 2012, and April 9, 2012,

respectively. Lijiang and HIUBC are two of only three colleges that comprise the Company's Traditional University Group segment.

71. As revealed on June 12, 2012, the third, FTBC, may have been transferred without authorization as well. These unauthorized transfers of Cast's key subsidiaries could not have taken place without Defendants' blind eyes and failure to set in place internal controls despite Deloitte's warning regarding its internal control failings.

CAST Vice President Shi Shicheng Misappropriates CAST Assets for Nearly 4 Years and Transfers Company Money to His Son

72. The Company's derelict internal controls facilitated Defendants' rampant fraudulent conduct stemming back as far as 2009. Indeed, as the Company first revealed on July 16, 2012, Chongqing police detained former FTBC Vice President Shi Shicheng for suspected involvement in loan fraud and misappropriation of FTBC school funds from 2009 through 2012.

73. In addition, Shi was involved in the transfer of HIUBC to himself and other unauthorized persons, as described below, by acquiring its holding company, Wuhan Jiyang Education Investment Co. Ltd. ("Jiyang") on March 7, 2012.

74. Not only did Shi pillage two of CAST's three TUG subsidiaries, but, as bank statements indicate, between January 1, 2012 and April 30, 2012, Shi engaged in a series of cash transfers to his son from the Company's bank accounts amounting to RMB 35.9 million or over $5.6 million.

Unauthorized Loans to Third Parties

75. Defendants allowed certain of the Company's subsidiaries to pledge approximately US$37 million in cash deposits on separate occasions to secure bank borrowings by parties unrelated to CAST. In at least one such instance, the unrelated parties involved defaulted on their loans and, as a result, the bank took the cash deposits pledged against this as collateral.

76. Defendants knew that the Company's internal controls were severely lacking. Nevertheless, they remained shoddy throughout the Class Period while Defendants' pervasive securities law violations stripped the Company of its businesses and its cash.

**III. Defendants Issue False Reassurances About It Cash Balances**

77. On August 10, 2011, the Company held its earnings conference call for the second quarter ended June 30, 2011. Defendant Chan provided false reassurances about CAST's cash balances in response to a question from an analyst.

> <Question>: Yeah. Okay. And then on the - again this goes to the, at least, my at least, long-term experience of the unusual nature of your valuation today, ***really almost reflects as though the cash on the balance sheet does not exist or even possibly that the three universities don't exist***. It's just funny. Great opportunity for us investors, but have there been any special, I'm sure you get this from other people, how do you approve the cash and - has Deloitte done any kind of special reviews or...? (emphasis added)
>
> <Answer - Defendant Chan >: Yes, actually, Deloitte has upgraded their cash check procedures, now they - on one hand, they are completely independently checking the cash and on the other hand they are doing it every quarter. They went through the same process. On the company side, we - our Audit Committee is actually discussing about finding independent agencies to do a cash check, but we want to run that through Deloitte first to hear them out. So our strategy right now is to finish the second Q audit and reporting, and then I think our Audit Committee will have a discussion with Deloitte to see what is there - the procedure and see what is their opinion. And then if necessary, then we can hire another independent agency to do a cash check. I will follow him with that. Yeah.

78. On October 4, 2011, the Company issued a press release attempting to allay investors' concerns regarding the delay of the Company's stock buy-back. The press release stated the following in relevant part:

> First, no question or concern has been raised by the Company's auditors, audit committee or any other relevant professional related to the Company's cash balances. As a result of several incidents that have been reported by auditors of other publicly held Chinese operating companies that have been unable to properly confirm cash balances, the Company will be engaging a third party service provider on a voluntary and proactive basis to conduct an independent confirmation in order to provide greater comfort to the marketplace on this issue and to differentiate the Company from those cases.
>
> Secondly, this effort bears no relation to the Company's stock repurchase program. Although the Company does not believe it will be able to accelerate repurchases under current price levels due to the constraints outlined in yesterday's shareholder letter, the Company does intend to continue repurchasing its shares subject to applicable blackout periods.

79. On October 6, 2011, the Company held a shareholder update conference call. During the conference call, Defendant Chan stated “Let me reiterate that no questions or concerns have ever been raised by the Company’s auditors or audit committee about our cash balances.”

80. Analysts were comforted by the Company’s false reassurances. For example, on October 6, 2011, analysts with Wunderlich Securities, Inc. rated the Company a “buy” and noted that “[t]he comments [at the October 6, 2011 Press Conference] were consistent with our expectations with respect to the tone of business as well as our understanding of the rationale for recent decisions to institute a shareholder rights plan, to make adjustments to the BOD composition, and to hire FTI Consulting to audit its cash balances.”

81. On November 10, 2011, the Company held its earnings conference call for the third quarter ended September 30, 2011. During the conference call, Defendant Chan stated the following:

> I would also like to provide you an update on the review of the company's cash position by an independent firm. Let me first reiterate that no questions or concern have ever been raised by the company's

auditors or audit committee about our cash balances. And we strongly believe our auditors' annual audit and quarterly reviews are sufficient to verify this balance. Our audit committee has informed me that the process is proceeding smoothly, and that we don't foresee any complication or delays in getting the final report out soon. We had hoped to have had the report ready in time for this earnings call, but now, we expect it shortly and we'll notify our shareholders of the final results when it is available.

Finally, with regard to our previously announced share buyback program, it is our intent, subject to periodic blackout periods, to re-initiate our share buyback claims in the fourth quarter. We will continue to carefully evaluate our investment options and deploy capital to areas where we see the greatest potential returns to our shareholders.

***

<Question - Richard S. Linhart>: …And do you still intend - I think on the last call last month, you had said you intend to actually buy back between $5 million and $10 million [of CAST shares] by year end and then $5 million per quarter going forward beyond that, is that still your game plan?

<Answer - Defendant Chan >: Yes.

82. On December 19, 2011, the CAST issued a shareholder letter wherein it reported the findings of FTI's audit of the Company's cash balances as of June 30, 2011. Specifically, the letter represented the following in relevant part:

BEIJING, Dec. 19, 2011 /PRNewswire-Asia-FirstCall/ -- ChinaCast Education Corporation (the "Company" or "ChinaCast") (Nasdaq GS:CAST), a leading post-secondary education and e-learning services provider in China, today announced that the Audit Committee of its Board of Directors (the "Audit Committee") retained FTI Consulting, Inc., ("FTI"), an independent global advisory firm with extensive expertise in forensic accounting and due diligence, to conduct an independent review of the Company's cash balances as of June 30, 2011.

> For no reason other than to counter the bad press a number of Chinese companies has received, the Company voluntarily retained FTI to perform an independent cash confirmation. No question or concern has been raised by the Company's auditors, audit committee or any other relevant professional related to the Company's cash balances.
>
> FTI independently obtained and reviewed documents which state that as of June 30, 2011, ChinaCast had cash, cash equivalents and term deposits totaling US$132.1 million (RMB 845,674,247) held with 29 PRC financial institutions. This total represents 98.5% of the total cash, cash equivalents and term deposit balances reported in the Company's form 10-Q for the second quarter ended June 30, 2011. The remaining 1.5% discrepancy is attributable to the termination of the Company's University of Petroleum e-learning joint venture.
>
> Daniel Tseung, Chairman of the Audit Committee, stated, "***We believe the findings contained in the FTI report should provide some comfort to shareholders as to the integrity of the Company's financial reporting and should serve to distinguish the Company from other Chinese companies that have received adverse publicity after failing to provide adequate verifications with respect to their financial statements***." (emphasis added).

83. Chan’s statements during the conference calls and the Comfort Letter were materially false and misleading because they incorrectly reported CAST’s cash balances and failed to disclose that CAST’s reported cash balances were inaccurate because (i) Shi had been misappropriating FTBC school funds during the period from 2009 to mid-2012; (ii) Shi caused the Company to participate in loan fraud during the period from 2009 to mid-2012; and (iii) because the undisclosed related party transfers to Chan began in June 2011 through the “readily apparent” inflows and outflows of cash to Chan and His Affiliates.

## IV. Defendants’ Additional Materially False and Misleading Statements During the Class Period

### A. False Statements and Reassurances Relating to CAST’s Internal Controls

84. On February 14, 2011, the Company issued a shareholder letter from Defendant Chan, wherein he responded to concerns about the circumstances of CAST's acquisition of Lijiang and HIUBC, recently acquired educational institutions, but failed to disclose the internal control deficiencies relating to CAST's ownership and control of these entities. Specifically, the letter represented the following in relevant part:

> Please understand that these locations are only the addresses of the WOFE (wholly owned foreign enterprise) holding companies that were acquired solely to facilitate these transactions. The WOFEs were pre-existing, acquired from the same source, and therefore have almost the same address. The close proximity of the WOFE offices does not evidence a connection between Xijiu or Rubao and there is none.
>
> For various regulatory, tax, and accounting reasons in China, after our first acquisition, we structured our subsequent acquisitions as offshore transactions, utilizing a WOFE structure. The companies that sell schools to us are holding companies that have been in existence at least since the inception of the school (here, the schools were almost a decade old when we bought them) and therefore in all cases they have assets other than the schools we are buying. Accordingly, the holding company must be reorganized to create a company that holds only the school that we acquire. That reorganized holding company is the WOFE. Because it takes a long time (usually 4 to 6 months) to create a new WOFE, and there are other logistical issues, the sellers used pre-existing WOFEs, -- Shanghai Xijiu (for the LJC acquisition) and Shanghai Rubao (for the HIUBC acquisition) – which had no active operating activities, a clean structure, a clean balance sheet, and a legal representative/director whom the seller finds trustworthy. Those are the entities whose addresses you are asking about. It would be wrong to draw any inference from the close proximity of the two WOFE addresses. That proximity does not evidence any connection between the two sellers, and there is none.
>
> ***
>
> As we noted above, prior to the transaction, the school is owned by a holding company with multiple shareholders and additional assets beyond the school we want to buy. In order to facilitate the

> transaction, the seller must reorganize itself into a new, offshore holding company with one asset: the school. The new holding company, which is the WOFE, acquires the old holding company – including the unpurchased assets – and then distributes the un-purchased assets to the shareholders of the old holding company. For that reason, the money that changes hands between the old holding company and the new holding company might bear no relation to the price we pay for the single asset – the school.

85. On March 17, 2011, the Company held an earnings conference call for the fourth quarter and full year ended December 13, 2010. Defendant Sena acknowledged that both CAST's Board and Management "took Deloitte's points seriously" about the internal control weaknesses; but attempted to downplay those weaknesses to only the two identified weaknesses.

> <Question - Jeff Lee>: Okay. Okay, and then last question from me and I'll turn it back over. Your 10-K, can you talk about the weakness in internal control mentioned by Deloitte and what you're doing to rectify that?
>
> <Answer - Defendant Sena>: Okay. Well, Deloitte this year is very sensitive in terms of the 404 review and they actually toughened up a lot of the review features because that's one area that I think SEC is looking at very closely. And hence we've got two items that actually got mentioned; one item is actually our financial resources. We need to strengthen the financial resources. We need to strengthen our accounting team by adding more people with U.S. GAAP experience and then with more people be able to work with Deloitte, and they fill the very big team when they do the audit. And so in the past few years basically, our people were – our resources was a lot less than what it should be so we will be strengthening that come this year, so that we basically - we have also done additional acquisitions and things like that, so we basically need to strengthen the corporate team.
>
> The other thing that was mentioned was basically some board meeting, just board resolutions were passed actually after the fiscal year-end that should have been passed during the year before the

contract is signed. Even though for this particular breakdown in control, the board was fully aware of the decision that the management is going to sign a contract, but on the other hand because we I mean - when this thing was detected by Deloitte that the resolution was not passed, we actually scheduled it to be passed on March 14.

So - and since that was considered, we basically did lots of pushing for putting a qualification on our internal control issue so that was actually the other item that was identified by Deloitte as a material weakness that was mentioned together in the report.

Now for the board issue, we basically - just basically have to step up our –for all non-recurring, irregular - non-regular contracts that are basically not going to get to management we will be passing - running them through the board before the contracts are signed from now on. So basically that is actually - has been the practice and there is only one particular breakdown because the contracts were sort of dated 31st of December 2010 and so basically, very quickly it was - when it was signed, it's already - the board was not alerted on the timing of it. So that was the breakdown. But so both items - the board and the management took Deloitte's points seriously and we basically will be putting all the resources to rectify these problems and make sure that we get that clean report again come the New Year.

86. These statements about the CAST's internal controls were materially false and misleading (i) Shi had been misappropriating FTBC school funds during the period from 2009 and mid-2012; and (ii) Shi caused the Company to participate in loan fraud during the period from 2009 and mid-2012. Moreover, given the fact that the Company's internal investigation into its reported cash balances only focused on an initial review period of June 2011 to April 2012, it is highly probable there will be additional misstatements relating to CAST's reported cash and assets, and internal controls.

**B. False Statements of Cash and Assets**

87. On March 16, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Chan, and Sena and reiterated the Company's previously announced annual financial results and financial position. The Form 10-K represented the following:

| | Year Ended December 31, | |
|---|---|---|
| | 2010 | 2009 |
| | (Amounts in thousands of RMB except share and per share data) | |
| Selected Consolidated Balance Sheet Data: | | |
| Cash and cash equivalents | 244,403 | 327,645 |
| Term deposits | 704,000 | 507,000 |
| Total assets | 2,894,190 | 2,273,149 |

88. On May 10, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Chan and Sena. The 10-Q also represented the following:

| | As of March 31, | | December 31, |
|---|---|---|---|
| | 2011 | 2011 | 2010 |
| | US$ (Note 1) | RMB | RMB (Note 1) |
| Current assets: | | | |
| Cash and cash equivalents | 48,856 | 317,563 | 244,403 |
| Total current assets | 157,200 | 1,021,797 | 1,067,433 |

| | | | |
|---|---|---|---|
| Total assets | 436,845 | 2,839,482 | 2,894,190 |

89. On August 9, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Chan and Sena. The 10-Q represented the following:

| | As of June 30, | | As of December 31, |
|---|---|---|---|
| | 2011 | 2011 | 2010 |
| | US$ | RMB | RMB |
| | (Note 1) | | (Note 1) |
| Current assets: | | | |
| Cash and cash equivalents | 65,905 | 428,382 | 244,403 |
| Total current assets | 147,420 | 958,231 | 1,067,433 |
| Total assets | 428,781 | 2,787,074 | 2,894,190 |

90. The above statements of cash and assets for fiscal year 2010 and the first two quarters of 2011 were materially false and misleading because (i) Shi had been misappropriating FTBC school funds during the period from 2009 to mid-2012; (ii) Shi caused the Company to participate in loan fraud during the period from 2009 to mid-2012; (iii) because the undisclosed related party transfers to Chan began in June 2011 and continued through April 2012 by way of "readily apparent" inflows and outflows of cash to Chan; and (iv) the Company's internal controls were woefully inadequate. Moreover, given the fact that the Company's internal investigation into its reported cash balances is only currently focused on an initial review period of June 2011 to April 2012, it is highly probable there will be additional misstatements relating to CAST's reported cash and assets.

91. On November 9, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Chan and Sena. The Form 10-Q also reported the following:

| | As of September 30, | | As of December 31, |
|---|---|---|---|
| | 2011 | 2011 | 2010 |
| | US$ | RMB | RMB |
| | (Note 1) | | (Note 1) |
| Assets | | | |
| Current assets: | | | |
| Cash and cash equivalents | 75,359 | 482,300 | 244,403 |
| Amounts due from related parties | 537 | 3,438 | 3,438 |
| Total current assets | 184,261 | 1,179,274 | 1,067,433 |
| Non-current deposits | 6,680 | 42,752 | 7,388 |
| Total assets | 471,813 | 3,019,611 | 2,894,190 |

92. The above statements of cash and assets for third quarter 2011 were materially false and misleading because: (i) Shi had been misappropriating FTBC school funds during the period from 2009 to mid-2012; (ii) Shi caused the Company to participate in loan fraud during the period from 2009 to mid-2012; and (iii) because the undisclosed related party transfers to Chan began in June 2011 and continued through April 2012 by way of "readily apparent" inflows and outflows of cash to Chan; (iv) the Company's internal controls were woefully inadequate; (v) the Company permitted illicit related party transactions by using the Company's assets to establish and operate education-related companies for unauthorized entities; and (vi) the Company permitted loans to third parties secured by Company assets.

**C. Defendants Continue to Mislead Investors Even Though The Writing Was on the Wall**

93. On March 16, 2012, the Company issued its last false reassurance when it filed a notification on Form 12b-25 with the SEC, signed by Defendant Sena, which stated its annual report would be delayed. The Form 12b-25 reported the following:

> ChinaCast Education Corporation (the "Company") experienced a disruption in its normal closing process and the preparation of its financial statements for the fiscal year ended December 31, 2011 as a result of an unexpected workload arising from certain fourth quarter and post-year end events, all of which have been previously disclosed. Specifically, the Company's management and accounting personnel spent a significant amount of time working with a special committee of independent directors formed in November 2011 to evaluate strategic alternatives to enhance shareholder value following an unsolicited buyout offer for the Company. The Company's management and accounting personnel have also spent a significant amount of time in connection with the proxy contest in December 2011 and early January 2012 as well as the review of its Form 10-K for the year ended December 31, 2010 by the Securities and Exchange Commission.

94. The late filing notice was materially false and misleading because: (i) Shi had been misappropriating FTBC school funds during the period from 2009 to mid-2012; (ii) Shi caused the Company to participate in loan fraud during the period from 2009 to mid-2012; (iii) Shi engaged in undisclosed transfers of cash to his son during January 2010 to April 2012; (iv) because the undisclosed related party transfers to Chan began in June 2011 and continued through April 2012 by way of "readily apparent" inflows and outflows of cash to Chan; (v) the Company's internal controls were woefully inadequate; (vi) the Company permitted loans to third parties secured by Company assets; and (vii) the Company

permitted the wrongful transfer of the Company's assets including two private colleges, Lijiang and HIUBC, to unauthorized persons.

## THE TRUTH GRADUALLY EMERGES

95. On October 3, 2011, the Company issued a letter to its shareholders "providing an update on its stock buyback program and recent Board governance decisions." Specifically, the Company disclosed that it was suspending its planned $50 million share buyback program and that it would hire an independent auditing firm to review its cash balances.

96. On this news, the Company's stock fell $1.11 per share or 30%, to close at $2.58 per share on October 3, 2011.

97. On March 26, 2012, the Board removed Defendant Chan from his role as Chairman and CEO.

98. On March 27, 2012, Defendant Sena resigned as CFO and Secretary.

99. On April 2, 2012, the Company announced that on March 27, 2012, it had received a letter from the NASDAQ advising that it was no longer in compliance with NASDAQ reporting requirements.

100. Also on April 2, 2012, the NASDAQ halted trading of the Company's stock at its last trading price of $4.24 pending its receipt of "additional information requested."

101. That same day, the Company's Board of Directors issued an open letter to CAST shareholders, accusing Defendant Chan of resisting the Board's efforts terminate him, as well as refusing to supply necessary financial documents to the Company's auditor. The letter also accused Defendant Chan of refusing to return Company chops, which are ornate seals necessary for Chinese companies to conduct much of their business. Moreover, the letter accused Defendant Chan of engaging in illegal activities. The letter stated, in relevant part:

> During the past several months, ChinaCast ("CAST") has undergone a dramatic transformation. After a highly contentious proxy contest

during December and early January, shareholders voted to elect a new slate of Directors which included two inside Directors (Ron Chan and Michael Santos) and four independent Directors (Ned Sherwood, Daniel Tseung, Derek Feng and Stephen Markscheid). Over the past three months, our new Directors have tried to work with CAST's management team to implement our changes. Unfortunately, we have encountered significant resistance from Ron Chan and a few of his top lieutenants.

***

Ron Chan and his accomplices have refused to provide the necessary financial information so as to allow the Company's auditors (Deloitte) access to the Shanghai offices in order to complete their field work and enable the Company to issue its 2011 audited financial statements within the time periods required by the SEC. Additionally, this group of uncooperative managers has improperly declined to pay outstanding invoices for the services of Deloitte and various other outside advisors and service providers.

Despite repeated efforts by the Board to get Ron Chan and these few managers to carry out their responsibilities and act in the best interest of the Company and all of its shareholders, it became clear last week that there would be no cooperation forthcoming. Consequently, our Board had to take extraordinary measures by terminating Ron Chan.

***

Notwithstanding all the recent positive changes, the Board must report some disturbing events as well. Ron Chan and a few other executives have chosen to unlawfully resist their terminations by refusing to return key company property, including corporate chops necessary to run the business in China. On Friday, in fact, Ron Chan improperly entered our Shanghai offices along with another terminated employee and informed Derek Feng that he had no intention to relinquish the corporate chops, an act which we believe constitutes theft. Additionally, we have uncovered questionable activities and transactions which raise the specter of possible illegal conduct by Ron Chan and his accomplices and may have led to the frustration of the audit of the Company's financial statements. We are taking all

> necessary legal actions to make sure that the acts which may have taken place do not go unpunished in China and elsewhere. If the Board determines that misdeeds have occurred, it will pursue all appropriate legal and governmental authorities in China, Hong Kong and the U.S. for prompt punitive actions against Ron Chan and his accomplices.
>
> The Board has also been made aware by several shareholders of unusual trading activity in CAST shares emanating from Hong Kong over the past several weeks. The SEC has been notified of this activity and has been asked to investigate it and also to determine whether there have been any illegal securities transactions effected by Ron Chan and others.
>
> The Board and loyal CAST managers are moving as quickly as possible to prevent damage to the Company and its shareholders. While we are still gathering information based on our knowledge to date, and we are confident that the day-to-day operations of the ELG and TUG businesses can continue to run smoothly unless further destructive actions are taken by Ron Chan and his accomplices. We also believe that once we remove the obstructions to that audit process that we believe Ron Chan has put in place, we can be successful in completing the audit in a reasonable amount of time.

102. On April 19, 2012, the Company filed a Form 8-K with the SEC revealing additional findings impacting the accuracy of the CAST's financial statements, including but not limited to, potentially undisclosed related party transactions, and the transfer of Lijiang and HIUBC to unauthorized persons. The Form 8-K disclosed the following in relevant part:

> The Company is also continuing to investigate whether there were questionable activities involving current and former employees, and if so, whether to pursue relevant civil and criminal legal remedies. In this regard, the Company's interim management team, along with various legal advisors and forensic consultants, has discovered the following matters which remain under investigation:
>
> · the unauthorized transfer of subsidiaries holding interests in two of the Company's colleges, Lijiang College and Hubei International

University Business College, to unauthorized persons outside of the Company group structure. The Company believes that its former chief investment officer and president-China, Mr. Xiangyuan Jiang, who was terminated on March 29, 2012, may have been involved in these unauthorized transfers. The Company's other school, Foreign Trade Business College, is owned by YPSH. These three colleges comprise all of the substantive operations of the Company's Traditional University Group segment ("TUG");

· actions by Mr. Chan, Mr. Jiang and their associates to prevent the Company from preparing its consolidated financial statements and related supporting documents and schedules, which in turn has prevented the completion of the 2011 audit of the Company's consolidated financial statements;

· a number of unpaid and delinquent ordinary expenses which continue to go unpaid as a former employee who holds the chops is selectively chopping certain payment requests, such as employee payroll, but not others, such as rent and vendor payments. The Company believes it may have identified the former employee holding these chops but is still unable to recover them and believes that this employee may be working with Mr. Chan. Further, the Company believes these actions are intended to undermine the authority of the new management of the Company and to frustrate the ability to complete the audit;

· possible destruction of Company documents and confirmed unauthorized removal of computer equipment in the Shanghai office;

· possible undisclosed related party transactions involving the use of Company assets to establish and operate education-related companies outside of the Company's group structure;

· possible undisclosed loans to third parties secured by Company assets and without the board's knowledge; and

· suspicious trading of Company securities, potentially by individuals or entities affiliated with former directors and officers, which the Company has discussed with the U.S. Securities and Exchange Commission enforcement staff.

103. The April 19 Form 8-K further reported on the internal strife at the Company, stating that:

> [O]n April 16, 2012, approximately 10 to 15 individuals not employed by the Company forcibly entered the Company's Shanghai office and stole some of the computers believed to be utilized by its finance department. Further, on April 17, 2012, individuals claiming to be associates of Mr. Chan unsuccessfully tried to occupy the Company's Shanghai office premises but were removed by the local police.

104. On May 8, 2012, the Company filed a Form 8-K with the SEC disclosing that the NASDAQ determined to delist CAST stock due to the Company's failure to file its Form 10-K for the year ended December 31, 2011.

105. On May 14, 2012, CAST filed a Form 8-K with the SEC providing an update on the Company's internal investigation into the transfer of Company funds and assets to unauthorized parties:

> **Investigations.** With respect to the Company's investigations into questionable activities involving Mr. Chan, Mr. Jiang and their associates, in addition to matters already disclosed in prior public filings, the Company's current management has discovered the following matters which remain under investigation:
>
> - evidence of the removal or destruction of a substantial portion of the financial documents that were located in the finance offices of the Company's Shanghai headquarters. The Company had disclosed in prior public filings that there was a possibility that Company documents had been destroyed;
>
> - the withdrawal of over Rmb760 million (approximately US$120 million) in cash from the bank accounts of CCT Shanghai and YPSH from July 2011 through April 2012 without the prior knowledge of the Company's Board of Directors. It is possible that some or all of the withdrawn cash could have been transferred to other Company accounts that the current management does not currently have access to or the cash could have been transferred out of the Company's control.

The Company's current management team is continuing to try to obtain access to additional bank records and may find that significantly more unauthorized withdrawals may also have been made from the Company's other bank accounts. As disclosed in the Company's 10-Q for the quarterly period ended September 30, 2011 filed on November 9, 2011, the Company had cash and cash equivalents of Rmb482.3 million (US$75.4 million) and term deposits of Rmb605.0 million (US$94.5 million) as of September 30, 2011. As disclosed in the Company's 10-K/A for year ended December 31, 2010 filed on February 24, 2012, the Company had cash and cash equivalents of Rmb244.4 million (US$37.0 million) and term deposits of Rmb704.0 million (US$106.7 million) as of December 31, 2010. The Company is also investigating whether any of the cash from these undisclosed withdrawals was used to make unauthorized payments to persons or entities affiliated with Mr. Chan or Mr. Jiang; and

- the appointment of a new legal representative, Shi Meiqin, to Chongqing Hai Lai Education Technology Co., Ltd., the subsidiary which holds the Company's interests in Foreign Trade Business College, according to AIC records. This appointment of Ms. Shi, who is not an employee of the Company, was made without the knowledge of the Company's board of directors.

106. On June 12, 2012, CAST filed a Form 8-K with the SEC confirming that approximately $120 million had been withdrawn from the bank accounts of two subsidiaries. In addition, CAST revealed the existence of a previously undisclosed credit facility that was past-due.

**CCT Shanghai and YPSH.** On May 25, 2012, the Company was issued replacement business licenses by the Shanghai Administration of Industry and Commerce ("AIC") for two of its subsidiaries, ChinaCast Technology (Shanghai) Limited ("CCT Shanghai") and Yupei Training Information Technology (Shanghai) Ltd. ("YPSH"), which business licenses list Chairman and interim Chief Executive Officer Derek Feng as CCT Shanghai's and YPSH's legal representative. CCT Shanghai and YPSH are the Company's

subsidiaries relating to its ELG business and its Foreign Trade Business College, respectively. The Company Law of the People's Republic of China ("PRC") generally requires a company in the PRC to appoint a legal representative to act on behalf of a company in exercising its functions and powers, according to the Company's PRC counsel.

On May 28, 2012, the Company was also issued replacement chops for CCT Shanghai and YPSH with the approval of the Shanghai Public Security Bureau. Under PRC law, companies use chops in lieu of signatures to execute contracts and evidence the authorization of corporate actions, according to the Company's PRC counsel. While the Company has been issued replacement chops, its old chops for CCT Shanghai and YPSH are still missing, which could result in the discovery of liabilities currently unknown to the Company.

After taking possession of the replacement business licenses and chops, the Company's current management was able to retrieve bank account balance information for CCT Shanghai and YPSH, which ***confirmed that virtually all of the cash in the bank accounts of CCT Shanghai and YPSH had been withdrawn without the prior knowledge of the Company's Board of Directors.*** (emphasis added)

As previously disclosed, CCT Shanghai and YPSH had sued former chairman and chief executive officer Ronald Chan Tze Ngon and former president-China Jiang Xiangyuan to recover the two subsidiaries' respective chops, business licenses, corporate certificates and financials records, among other things, in People's Court of Pudong New District, Shanghai (the "Pudong Court"), and Mr. Chan had applied to move the case to a different court. The Pudong Court granted Mr. Chan's application to move the case to the People's Court of Changning District, Shanghai, on May 15, 2012, a decision which the Company has appealed. As the Company has already acquired the replacement chops and business licenses (and has started applying for the various replacement corporate certificates) of these two subsidiaries, the Company has filed motions to dismiss all but the financial records portion of this litigation.

**ELG Business.** In May 2012, the Company learned that the variable-interest entity running its ELG business, ChinaCast Li Xiang Co. Ltd.

("CCLX"), stopped operating because it could no longer provide the necessary services for the business. The Company's understanding is that the satellite operator that CCLX used had stopped providing CCLX with access to its satellites because CCLX was delinquent in its payments. The Company further understands that CCLX is also delinquent in paying other creditors and that CCLX has let go most of its employees. The Company is continuing to perform an in-depth review of the ELG business and is evaluating the financial accounting impact of these events.

The Company has also been informed of, and is investigating, a previously undisclosed Rmb25.0 million (approximately US$3.9 million) working capital credit facility that CCLX had borrowed from Bank of Hangzhou. The credit facility, made available as of April 28, 2011, and due on April 27, 2012, was guaranteed by YPSH (which guarantee was also previously undisclosed). The Company has been informed by Bank of Hangzhou that Mr. Chan, Mr. Jiang and chief operating officer Li Wei (among others) may have provided personal guarantees on the loan as well. The Company's current management was informed by the Bank of Hangzhou that CCLX drew Rmb2.4 million from the facility on April 28, 2011, and the remaining Rmb22.6 million from the facility on May 9, 2011. The facility accrued interest at 130% of the People's Bank of China ("PBOC") one year lending rate, payable quarterly. As CCLX did not repay the loan at maturity, on May 3, 2012, the Bank of Hangzhou sued CCLX and YPSH (along with the other guarantors) in People's Court of Xuhui District, Shanghai, for approximately Rmb24.8 million in unpaid principal, as well as unpaid interest, default interest and litigation expenses. The Company is assessing what, if any, impact this may have on prior financial statements.

The matters relating to the ELG business disclosed above could have a material and adverse effect on the Company's business, results of operations and financial condition, could delay the Company's reporting of financial results, and could result in delays in financial reporting for future periods. Furthermore, the matters relating to the ELG business disclosed above could impact the Company's ability to consolidate certain assets for financial reporting purposes, result in a significant impairment or write-off, and/or result in additional liabilities that the Company's management is currently not aware of.

**Private Colleges.** As previously disclosed in its Form 8-K filed May 14, 2012, Chongqing AIC records reflect that a third party not employed by the Company, Shi Meiqin, had been appointed the legal representative of Chongqing Hai Lai Education Technology Ltd. ("Hai Lai"), the holding company for its Foreign Trade Business College, without the knowledge of the Company's board of directors. Based on additional AIC record searches, a new legal representative, Luo Nianru, had recently been registered as the legal representative of record of Hai Lai, without the prior knowledge of the Company's board of directors. AIC records still reflect that YPSH still owns 80% of Hai Lai and another Company subsidiary, Chongqing Chaosheng Education and Investment Co., Ltd., owns the remaining 20%. However, based on conversations with the purported transferees, the Company believes that Mr. Chan, Mr. Jiang and/or their associates may have already made a purported transfer of all of the Company's shares in Hai Lai to unauthorized third parties without the Board of Directors's knowledge, in one or more transactions that are pending recordation with the AIC.

As disclosed in prior public filings, the Company's interests in the holding companies for Hubei International University Business College and Lijiang College had been transferred to unauthorized persons, on March 7, 2012, and April 9, 2012, respectively. The Company is investigating the unauthorized transfers of these two (and possibly all three) of the Company's private colleges and considering the legal remedies available to it to recover its interests in the colleges, including by means of invalidating the original transfers and bringing criminal actions against the parties responsible for such transfers. Any legal actions taken by the Company to recover its interests in these colleges could require proceedings that last for a considerable length of time and could ultimately be unsuccessful. The Company has also begun active discussions with the purported transferees of the three private colleges to reach a resolution that may obviate the need for actual litigation.

To the extent the Company is unable to regain control over any of its private colleges or any of its other assets or loses control of over additional assets or if the results of its investigatory efforts reveal fraud or other illegal conduct, the Company's business and operations

> will be materially and adversely harmed. Also, even if the Company is eventually successful in recovering its interests in these colleges, the value of the cash and other assets of these colleges may have decreased, perhaps significantly, by that time, as a result of misappropriation, mismanagement, additional liabilities incurred while the colleges are under the control of the purported transferees, or otherwise. In addition, the matters discussed herein continue to delay the Company's reporting of financial results and could result in delays in financial reporting for future periods. Furthermore, these matters could also impact the Company's ability to consolidate certain assets for financial reporting purposes, result in a significant impairment or write-off, and/or result in additional liabilities that the Company's management is currently not aware of.

107. The adverse disclosures above were not absorbed by the market until June 25, 2012, when trading of the Company's stock finally resumed over-the-counter after an almost three month trading halt. That day, the stock price closed at $0.82 on unusually heavy trading volume, a decline of over 80% from its $4.24 price at the time of the trading halt.

108. On July 16, 2012, CAST filed a Form 8-K with the SEC disclosing that the Company's former vice president in charge of FTBC was being investigated for misappropriation of funds and loan fraud dating back to 2009:

> *Additional Information on Investigations into Questionable Activities*
>
> Further to its prior public filings, the Company hereby provides the following additional information regarding its investigations into questionable activities involving Mr. Chan, Mr. Jiang and/or their associates, which remain under investigation:
>
> The Company has been informed that Mr. Shi Shicheng, the former vice president who represented the Company at FTBC, has been detained by Chongqing police since mid-June 2012 and is being investigated for his suspected involvement in loan fraud and misappropriation of FTBC school funds during the period from 2009 to 2012.

> The Company had previously disclosed that it had discovered evidence that Mr. Shi may have been involved in the purported transfer of its Hubei Industrial University Business College ("HIUBC") to himself and other unauthorized persons without the approval of the Company's board of directors. As previously disclosed, according to records filed with the Wuhan Administration of Industry and Commerce ("AIC"), Mr. Shi (as to 30%) and Mr. Jiang (as to 70%) purportedly acquired from the Company its equity interest in Wuhan Jiyang Education Investment Co. Ltd. ("Jiyang"), the holding company for HIUBC, on March 7, 2012. As previously disclosed, Mr. Shi and Mr. Jiang purportedly transferred their interests in Jiyang to Wei Hua (as to 40%), Xie Jiwu (as to 40%) and Zhan Xiaochun (as to 20%) on April 5, 2012, according to Wuhan AIC records.
>
> Separately, the Company has also obtained bank statements which possibly indicate that from January 1, 2012, to April 30, 2012, there may have been a series of cash transfers between Mr. Shi Shicheng's son, Mr. Shi Qinyan, and the Company that were not authorized by the Company's board of directors, which may have included the unauthorized transfer of an aggregate Rmb35.9 million from the Company's bank accounts to Mr. Shi Qinyan.

109. On July 30, 2012, CAST filed an 8-K with the SEC providing an update into the Company's internal investigation regarding the transfer of Company funds and assets to unauthorized parties:

> **Additional Information on Investigations into Questionable Activities**
>
> ***Embezzlement of Funds by Prior Management***. As previously disclosed in the Company's Form 8-K dated May 14, 2012, the Company learned that approximately US$120 million in cash was withdrawn from bank accounts of the Company's Shanghai-based subsidiaries, namely Yupei Training Information Technology (Shanghai) Ltd. ("Yupei") and ChinaCast Technology (Shanghai) Limited ("CCT SH"), over a period of time beginning in July 2011, and greatly accelerating in November 2011, through unauthorized transfers directed by Prior Management. Also as previously disclosed in the Company's Form 8-K dated June 12, 2012, upon regaining

possession of the replacement business licenses and chops necessary to take certain actions for Yupei and CCT SH, the Company gained full access to the bank statements of Yupei and CCT SH and began an audit of these accounts.

The Company recently hired a Shanghai-based forensic accounting firm to assist with the audit. Our findings to date, which have been based on reviews of the bank statements over an initial review period from June 2011 to April 2012 (the "Initial Review Period") and other evidence, have revealed a series of frequent (almost daily), readily identifiable and significant inflows and outflows of cash involving family members, friends and related companies of Prior Management and other unrelated companies. Such transfers appear to be unconnected and inconsistent with the Company's historical revenue collection cycle and normal expenditures for operations. While it is too early to conclude the exact nature and purpose of such inflows and outflows of cash from these bank accounts, the Company believes that these transfers were done at the direction of Prior Management without authorization from the Company's board of directors and for improper purposes.

Our findings to date have also revealed that certain subsidiaries of the Company pledged a total of approximately US$37 million in cash deposits on separate occasions to secure bank borrowings by unrelated parties. In one such instance, the Company has learned that the unrelated party involved defaulted on its loan and, as a result, the cash deposits pledged against such loan were taken by the bank as collateral for the loan. It is unclear to the Company why Prior Management would pledge the Company's cash deposits as collateral to secure bank borrowings of unrelated parties.

The Company, with the assistance from the Shanghai-based forensic accounting firm, is in the process of auditing the bank account transactions of Yupei and CCT SH for periods prior to the Initial Review Period as well as beginning a review of cash transfers occurring with the Company's offshore bank accounts.

All of the above information is in the process of being shared and reviewed by various China government officials, law enforcement authorities and banking authorities across all relevant jurisdictions. In

> some cases, certain law enforcement authorities are sharing information with the Company. The Company intends to seek full recovery of its cash balances illegally removed from its bank accounts by Prior Management.

## CLASS ACTION ALLEGATIONS

110. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons who purchased or acquired CAST securities during the Class Period (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

111. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CAST securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CAST or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

112. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

113. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CAST;
- whether the Individual Defendants caused CAST to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of CAST securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Applicability of Presumption of Reliance:**

Affiliated Ute

116. Neither Plaintiff nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

<u>Fraud on the market presumption of reliance</u>

117. Lead Plaintiffs may rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. CAST stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. During the class period, on average, 2.07 million shares of CAST common stock were traded on a weekly basis. According to Bloomberg LP on November 6, 2011: (i) there were 49 million shares of CAST stock were outstanding; and (ii) the public float, or the shares not held by insiders that were publicly available for trade, was 38.5 million. Approximately 5.4% of the public float, and 4.24% of all outstanding shares, were bought and sold on a weekly basis, demonstrating a strong presumption of an efficient market;

c. As a regulated issuer CAST filed with the SEC periodic public reports and was eligible to file S-3 registration statements with the SEC during the Class Period;

d. CAST regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire

services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. CAST, during the Class Period, was followed by several securities analysts and research firms employed by major brokerage firms including Wunderlich Securities, Roth Capital Partners, and Standard & Poors, Zacks (among others).

f. At least 75 NASD member firms were active market-makers in CAST stock at all times during the Class Period; and

g. Unexpected material news about CEU was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

118. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**CLAIMS FOR RELIEF**

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

119. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

121. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CAST securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase CAST securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

122. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CAST securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CAST's finances and business prospects.

123. By virtue of their positions at CAST, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

124. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CAST, the Individual Defendants had knowledge of the details of CAST's internal affairs.

125. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CAST. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CAST's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CAST securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CAST's business and financial condition which were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased CAST securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

126. During the Class Period, CAST securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of CAST securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Lead Plaintiffs and the Class, the true value of CAST

securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of CAST securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

127. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

128. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**(Against the Individual Defendants for Violations of**
**Section 20(a) of the Exchange Act Against The Individual Defendants)**

129. Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130. (a) During the Class Period, the Individual Defendants participated in the operation and management of CAST, and conducted and participated, directly and indirectly, in the conduct of CAST's business affairs. Because of their senior positions, they knew the adverse non-public information about CAST's misstatement of cash balances and internal controls.

(b) As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CAST's financial condition and results of operations, and to promptly correct any public statements issued by CAST which had become materially false or misleading.

(c) Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of

the various reports, press releases and public filings which CAST disseminated in the marketplace during the Class Period concerning CAST's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CAST to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CAST within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CAST securities.

131. Each of the Individual Defendants, therefore, acted as a controlling person of CAST. By reason of their senior management positions and/or being directors of CAST, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause CAST to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CAST and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

132. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CAST.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs hereby demands trial by jury of all issues that may be so tried.

Dated: September 17, 2012

**THE ROSEN LAW FIRM, P.A.**



__________________________
Laurence Rosen (SBN 219783)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**
Jeremy A. Lieberman
Tamar A. Weinrib
Samuel J. Adams
600 Third Avenue - 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS, LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street - Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**Co-Lead Counsel for Lead Plaintiffs**

# EXHIBIT 1

Case 3:06-cv-01654 Document 39-6 Filed 04/25/2008 Page 2 of 4



## EXHIBIT 12-1

## ILLUSTRATIVE REPRESENTATION LETTER

To [*Independent Auditor*]

We are providing this letter in connection with your audit(s) of the [*identification of financial statements*] of [*name of entity*] as of [*dates*] and for the [*periods*] for the purpose of expressing an opinion as to whether the [*consolidated*] financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of [*name of client*] in conformity with accounting principles generally accepted in the United States of America. We confirm that we are responsible for the fair presentation in the [*consolidated*] financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, [*as of (date of auditor's report),*] the following representations made to you during your audit(s).

1. The financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America.
2. We have made available to you all—
   a. Financial records and related data.
   b. Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.
3. There ha(ve)s been no communication(s) from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices.
4. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.
5. We believe that the effects of the uncorrected financial statement misstatements summarized in the accompanying schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Case 3:06-cv-01654 Document 39-6 Filed 04/25/2008 Page 3 of 4



## EXHIBIT 12-1 (Continued)

> **Practical Consideration.** If management believes that certain of the identified items are not misstatements, management may say, for example, "We do not agree that items XX and XX constitute misstatements because. . . ."

6. We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.
7. We have no knowledge of any fraud or suspected fraud affecting the entity involving—
   a. Management,
   b. Employees who have significant roles in internal control, or
   c. Others where the fraud could have a material effect on the financial statements.
8. We have no knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.
9. The entity has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.
10. The following have been properly recorded or disclosed in the financial statements:
    a. Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties.
    b. Guarantees, whether written or oral, under which the company is contingently liable.
    c. All significant estimates and material concentrations known to management that are to be disclosed in accordance with the AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties.* [*Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.*]
11. There are no—
    a. Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.
    b. Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Financial Accounting Standards Board (FASB) Statement No. 5, *Accounting for Contingencies.*

**EXHIBIT 12-1 (Continued)**

c. Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB Statement No. 5.

12. The entity has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral.
13. The entity has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

*[Add additional representations that are unique to the entity's business or industry. See paragraph 7 and appendix B, "Additional Representations," of SAS No. 85.]*

To the best of our knowledge and belief, no events have occurred subsequent to the balance-sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned financial statements.

______________________________
[Name of Chief Executive Officer and Title]

______________________________
[Name of Chief Financial Officer and Title]

---

**Additional Representations**

12.402 The representation letter should be tailored to the circumstances. It should include additional representations specific to the entity's business or industry; for example, when the financial statements disclose significant conditions and management's plans relating to the entity's ability to continue as a going concern or when management intends to hold to maturity debt securities classified as held-to-maturity. Terminology should be revised appropriately when financial statements are presented on an OCBOA. Appendix B of SAS No. 85 lists, and provides illustrative wording of, representations that address common situations. EXHIBIT 12-2 lists the items from Appendix B.

12.403 On the other hand, the auditor does not have to obtain representations that are irrelevant to the client's situation. For example, representations about inventory may be omitted if the client does not have inventory.

# EXHIBIT 2

March 15, 2003 [*Note: This date must be* no earlier *than the date on the review report.*]

Mr. Tom Ratcliffe
Munter & Ratcliffe, CPAs
Miami, Florida

Dear Mr. Ratcliffe:

We are providing this letter in connection with your review of our balance sheets as of December 31, 2002, and December 31, 2001, and our statements of income and statements of cash flows for the years then ended, for the purpose of expressing limited assurance that there are no material modifications that should be made to the financial statements of Ann Wholesale in order for them to be in conformity with generally accepted accounting principles. We confirm that we are responsible for fair presentation in the statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, as of March 15, 2003 [*Note: This date must be* no earlier *than the date on the review report.*], the following representations made to you during your review.

1. The financial statements referred to above are fairly presented in conformity with generally accepted accounting principles.
2. We have made available to you all:
   a. Financial records and related data.
   b. Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.
3. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.
4. We have no plans or intentions that may materially affect the carrying amounts or classification of assets and liabilities.
5. There are no material losses [e.g., from obsolete inventory or purchase or sales commitments] that have not been properly accrued or disclosed in the financial statements.
6. There are no:
   a. Violations or possible violations of laws or regulations, where the effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.
   b. Unasserted claims or assessments that our lawyer has advised us are probable of assertion that must be disclosed in accordance with Financial Accounting Standards Board [FASB] Statement No. 5, entitled *Accounting for Contingencies*. [*Note: This representation needs to be modified in circumstances where the client has not consulted an attorney.*]
   c. Other material liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB Statement No. 5.
7. The company has satisfactory title to all owned assets, and there are no liens or encumbrances on these assets, nor has any asset been pledged as collateral. [*Note: This representation needs to be modified when assets have been pledged as collateral.*]
8. We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.
9. The following have been properly recorded or disclosed in the financial statements:
   a. Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements, guarantees, and amounts receivable from or payable to related parties.
   b. Guarantees, whether written or oral, under which the company is contingently liable.
   c. Significant estimates and material concentrations known to management that are required to be disclosed in accordance with the AICPA's Statement of Position 94-6, entitled *Disclosure of Certain Significant Risks and Uncertainties* [*Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.*].

[*Add additional representations that are unique to the reporting entity's business or industry.*]

10. To the best of our knowledge and belief, no events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned financial statements.
11. We have responded fully and truthfully to all inquiries made to us by you during your review.

<u>Sue Beasley</u>
Chief Executive Officer and President
<u>William R. Sims</u>
Chief Financial Officer

*Note: This is a sample letter. Some items in it may not apply to every engagement. For example, if the client has not*