**UNITED STATES DISTRICT COURT**                                         JS-6
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 12-4621-JFW (PLAx)**                    Date: December 7, 2012

Title:      IN RE CHINACAST EDUCATION CORPORATION SECURITIES  LITIGATION

**PRESENT:**

　　　**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

　　**Shannon Reilly**                                    **None Present**
　　**Courtroom Deputy**                                  **Court Reporter**

**ATTORNEYS PRESENT FOR PLAINTIFFS:**    **ATTORNEYS PRESENT FOR DEFENDANTS:**
　　　　　None                                            　　　　　None

**PROCEEDINGS (IN CHAMBERS):**    **ORDER GRANTING DEFENDANTS CHINACAST EDUCATION CORPORATION AND ITS INDEPENDENT DIRECTORS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT [filed 10/15/12; Docket No. 44]**

On October 15, 2012, Chinacast Education Corporation ("Chinacast") and Derek Feng ("Feng"), Stephen Markscheid ("Markscheid"), Ned Sherwood ("Sherwood"), and Daniel Tseung ("Tseung")[1] filed a Motion to Dismiss the Consolidated Class Action Complaint ("Motion").  On October 29, 2012, Lead Plaintiffs Costa Brava Partnership III LP ("Costa Brava") and Jayhawk Private Equity Fund II LP ("Jayhawk") (collectively, "Plaintiffs") filed their Opposition.  On November 12, 2012, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's November 19, 2012 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

I.    **Factual and Procedural Background**

    A.    **The Defendants**

ChinaCast is a Delaware corporation in the business of providing college-level education to

---

　　[1] Collectively, Feng, Markscheid, Sherwood, and Tseung are referred to as the "Individual Defendants."  The Individual Defendants and Chinacast are collectively referred to as "Defendants."

students in China both on-campus and on the internet. During the putative class period, from February 14, 2011 until April 2, 2012, ChinaCast was listed on the NASDAQ stock exchange. Markscheid has served as a member of ChinaCast's Board of Directors since October 3, 2011. Sherwood has served as a member of the Board of Directors since 2009. Tseung has served as a member of the Board of Directors since 2007. Feng has served as a member of ChinaCast's Board of Directors since January 17, 2012, and, upon the termination of Ron Chan Tze Ngon ("Chan"), Feng agreed to serve as Chairman and Interim CEO. Sherwood and Tseung, along with Justin Tang ("Tang"), are members of ChinaCast's audit committee.

### B.    Procedural Background

On May 25, 2012, Alejandro Puente ("Puente") filed a putative class action against ChinaCast, Chan, and Antonio Sena ("Sena") on behalf of all purchasers of ChinaCast securities between February 14, 2011, and April 2, 2012, alleging claims for relief for: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5; and (2) violation of Section 20(a) of the Exchange Act [Case No. CV 12-4621-JFW (PLAx)] (the "*Puente* Action"). On June 12, 2012, Eliahu Nakash ("Nakash") filed a separate putative class action against the same defendants on behalf of all purchasers of ChinaCast securities between February 14, 2011, and April 2, 2012 [Case No. CV 12-5107-JFW (PLAx)] (the "*Nakash* Action"), with virtually identical factual allegation, and alleging the same claims for relief, as in the *Puente* Action. On August 22, 2012, the Court consolidated the *Puente* Action and the *Nakash* Action, appointed Costa Brava and Jayhawk as lead plaintiffs, and appointed lead counsel. On September 17, 2012, Plaintiffs filed their Consolidated Class Action Complaint ("Complaint") against ChinaCast, Chan, Sena, Michael Santos ("Santos"), Tang, Tseung, Sherwood, Markscheid, and Feng. In their Complaint, Plaintiffs allege claims for relief for: (1) violation of Section 10(b) of the 1934 Act and Rule 10b-5; and (2) violation of Section 20(a) of the 1934 Act.

### C.    Chan's Looting and Removal

Chan was the founder of ChinaCast and began serving as CEO and Chairman in 1999. On March 26, 2012, the Individual Defendants removed Chan as Chairman and CEO when they discovered that Chan was attempting to interfere with an annual audit of ChinaCast. On April 2, 2012, ChinaCast disclosed that, following Chan's removal, ChinaCast "uncovered questionable activities and transactions which raise the specter of possible illegal conduct by Ron Chan and his accomplices…." ChinaCast also announced that it would continue to investigate and, if necessary, pursue all appropriate civil and criminal legal remedies. On April 19, 2012, ChinaCast filed a Form 8-K with the SEC that stated, in part:

> The Company is also continuing to investigate whether there were questionable activities involving current and former employees, and if so, whether to pursue relevant civil and criminal legal remedies. In this regard, the Company's interim management team, along with various legal advisors and forensic consultants, has discovered the following matters which remain under investigation:
>
> > the unauthorized transfer of subsidiaries holding interests in two of the Company's colleges . . . to unauthorized persons outside of the Company group structure. The Company believes that its former chief

Initials of Deputy Clerk __sr__

investment officer and president-China, Mr. Xiangyuan Jiang [("Jiang")], who was terminated on March 29, 2012, may have been involved in these unauthorized transfers.

The Form 8-K also revealed that ChinaCast was investigating other possibly illegal and unauthorized actions by Chan, Jiang, and others, including their efforts: to prevent the preparation of its consolidated financial statements, to destroy ChinaCast documents, to remove computers from ChinaCast's Shanghai office without authorization, to engage in undisclosed related party transaction, to engage in undisclosed third party loans, and to engage in the suspicious trading of ChinaCast securities.

As the investigation unfolded, ChinaCast filed a Form 8-K with the SEC on May 14, 2012, which disclosed that its investigation had expanded to include the possible wrongful withdrawal of approximately $120 million from ChinaCast's accounts.  On June 12, 2012, ChinaCast filed another Form 8-K with the SEC that disclosed its investigation had confirmed the wrongful withdrawal of funds from its accounts.  The Form 8-K also disclosed that ChinaCast believed that Chan, Jiang, and others may have transferred control of ChinaCast's interests in certain private colleges to unauthorized third parties without the knowledge or approval of the Board of Directors. The Form 8-K reported that ChinaCast was continuing to investigate the unauthorized transfers and was considering the legal remedies available to it to recover its interest in the colleges, including possible criminal action.

Immediately after it announced that it had discovered Chan had looted corporate assets, ChinaCast, through the Individual Defendants, pursued all available legal remedies to recover ChinaCast's assets, including its civil and criminal legal remedies in China.

### D. Summary of Factual Allegations in the Complaint

According to Plaintiffs, Defendants were aware of the weaknesses in ChinaCast's internal controls substantially before Chan's removal as CEO and Chairman.  Specifically, Plaintiff alleges that in its 10-K for the year ending December 31, 2010, ChinaCast noted that its auditor, Deloitte Touche Tohmatsu CPA Ltd. (an affiliate of Deloitte & Touche, LLP) ("Deloitte"), had uncovered at least two material weaknesses in ChinaCast's internal controls.  According to Deloitte, one of those weaknesses involved the Board of Director's failure to authorize a non-recurring, irregular contract that should have been approved by the Board of Directors before that contract was signed.  In response to Deloitte's findings, the Board of Directors vowed to "step up" its efforts to approve all non-recurring, irregular contracts before they were signed, and assured investors that "the board and the management took Deloitte's points seriously and we basically will be putting all the resources to rectify these problems and make sure that we get that clean report again come the New Year."

Plaintiffs also allege that Defendants ignored several "red flags" during 2011 because there were a series of public scandals that should have alerted directors of China-based, U.S-listed

Initials of Deputy Clerk __sr_

companies, such as ChinaCast, that the companies they directed posed acute fraud risks.[2]
Plaintiffs further allege that despite these warning signs -- both company-specific and sector-wide
-- and despite the Board of Director's agreement to immediately review all "non-recurring, irregular
contracts," the Board of Directors recklessly allowed or failed to prevent Chan from siphoning cash
from ChinaCast in a series of related-party transactions beginning in approximately June 2011.  In
addition, Plaintiffs allege that the Board of Directors allowed the filing of financial statements with
the SEC that omitted any mention of these transactions.[3]

Moreover, Plaintiffs allege that Defendants engaged in misleading conduct when they
decided to search for a firm that was interested in acquiring ChinaCast despite the obviousness
and pervasiveness of the fraud.  Plaintiffs allege that soon after Chan began openly transferring
ChinaCast's resources to himself, ChinaCast began to seek an acquirer.  Specifically, Plaintiffs
allege that in early June 2011, Defendants Chang and Tang met with the managing director of a
private equity firm ("Firm A"), and, on that same day, Tang disclosed to the Board of Directors that
Firm A had expressed an interest in investing in or acquiring ChinaCast.  Plaintiffs also allege that,
on August 4, 2011, Defendant Sena informed the Board of Directors that ChinaCast had received a
bid from another company ("Company B") to acquire all of ChinaCast's shares, and this bid offered
ChinaCast between $6.46 and $6.94 per share, which included a significant premium over the July
29, 2011 closing price of $4.92.  Plaintiffs allege that ChinaCast failed to promptly disclose the
existence of the bid to the investing public, and that Sherwood, capitalizing on his knowledge of the
potential acquisition, purchased a block of 107,305 shares for $5.00 each on August 12, 2011.[4]

Plaintiffs allege that the truth regarding the fraud began to be revealed on October 3, 2011,
when ChinaCast announced that it was suspending its previously-announced stock buyback plan,
and disclosed that it was hiring an independent auditing firm, FTI Consulting, Inc. ("FTI"), to audit
its cash balances.  That day, ChinaCast's stock price fell $1.11 per share, and closed at $2.58 per
share.  In a press release on October 4, 2011, ChinaCast claimed that its engagement of FTI did

---

[2]  In their Complaint, Plaintiffs discuss various public statements and media reports from
2011 to support its allegation that ChinaCast, by virtue of being a China-based, U.S-listed
company, was an acute fraud risk.  For example, SEC Commissioner Luis Aguilar, the Public
Company Accounting Oversight Board ("PCAOB"), and various news reports purportedly called
attention to the acute fraud risks posed by China-based companies listed on U.S. exchanges.
Plaintiffs also cite to a letter dated April 11, 2011, from the Honorable Patrick T. McHenry, in his
capacity as Chairman of the House Subcommittee on TARP, Financial Services, and Bailouts of
Public and Private Programs, asking the SEC to outline its efforts to protect investors from fraud
committed by companies based in China.

[3]  Plaintiff's allege that after Chan was removed, ChinaCast's SEC filings disclosed that the
related-party transfers: were "frequent (almost daily)"; were "readily identifiable and significant";
"involv[ed] family members, friends and related companies of Prior Management"; "appear to be
unconnected and inconsistent with [ChinaCast's] historical revenue collection cycle and normal
expenditures for operations"; and amounted to $120 million.

[4]  Plaintiffs allege that this purchase would have allowed Sherwood to net between
$156,000 and $207,000 if Company B's bid had been accepted.

Initials of Deputy Clerk  sr

not result from any company-specific concern, but that FTI had been engaged "[a]s a result of several incidents that have been reported by auditors of other publicly held Chinese operating companies that have been unable to properly confirm cash balances."

## II.     Legal Standard

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") govern the pleading requirements for claims under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.  *See Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999); *Cooper v. Pickett*, 137 F.3d 616, 628 n. 2 (9th Cir. 1997).

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The heightened pleading requirements of Rule 9(b) are designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993).  In order to provide this required notice, "the complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity."  *Id.* at 672.  Further, "a pleader must identify the individual who made the alleged representation and the content of the alleged representation."  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999).

The PSLRA requires a heightened pleading standard for allegations regarding misleading statements and omissions that is similar to the heightened pleading standard required by Rule 9(b).  "The purpose of this heightened pleading requirement was . . . to put an end to the practice of pleading 'fraud by hindsight.'"  *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084-85 (9th Cir. 2002) (quoting *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 988 (9th Cir. 1999)).  The PSLRA specifically provides:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

In addition, the PSLRA requires a heightened pleading standard for state of mind: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also Silicon Graphics*, 183 F.3d at 974 ("We hold that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct").  "To allege a 'strong inference of deliberate recklessness,' [the plaintiffs] 'must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.'"  *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir. 2002) (quoting *Silicon Graphics,* 183 F.3d at 974).  "[R]ecklessness only satisfies scienter under § 10(b) to the extent it reflects some degree of intentional or knowing misconduct."  *Silicon Graphics,* 183 F.3d at 976-77.

Initials of Deputy Clerk _sr_

## III.    Discussion

### A.    Standard for Violation Of Section 10(b) And Rule 10b-5

Section 10(b) makes it unlawful:

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In a typical section 10(b) or Rule 10b-5 private action, a plaintiff must prove: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005); *Stoneridge Investment Partners, LLC. v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008).

### B.    Plaintiffs Failed to Plead Scienter Adequately.

To adequately plead scienter under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics*, 183 F.3d 970, 975 (9th Cir. 1999).  Plaintiffs must plead "at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness."  *In re Silicon Graphics*, 183 F.3d at 979.  To satisfy this pleading requirement, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless[,] false or misleading nature of the statements when made."  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  In addition, the Supreme Court recently

Initials of Deputy Clerk  sr

described the appropriate method for determining if the "strong inference" requirement for alleging scienter had been met:

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind.  Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.  To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  In deciding if scienter has been adequately pled, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.*, at 322-23 (2007) (citations omitted); *see, also, Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 987 (9th 2009) (holding that the Supreme Court's "decision in *Tellabs* does not materially alter the particularity requirements for scienter claims established in our previous decisions, but instead only adds an additional 'holistic' component to those requirements").

### 1.   Plaintiffs Failed to Plead Particularized Allegations of Scienter Against the Individual Defendants

Plaintiff's allegations, when considered collectively, do not give rise to a strong inference of scienter.  In fact, "there is a total absence of factual allegations that would permit a strong inference that" the Individual Defendants knew about Chan's illegal activities prior to the end of March 2012 or that any representations or statements they made with respect to ChinaCast "were false or misleading when made" or that the Individual Defendants "acted in deliberately reckless disregard of their truth or falsity." *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1089.  Instead, the Complaint simply contains scattered and conclusory allegations that "Defendants," who are pled as an undifferentiated group, had "actual knowledge" or "acted with reckless disregard for the truth."[5]  However, "[w]ithout corroborating facts, it is

_____

[5]  In their Opposition, and contrary to the allegations of the Complaint, Plaintiffs concede that the Individual Defendants did not have any actual knowledge of Chan's illegal activities prior to the Individual Defendants' discovery and disclosure of those activities in March and April of 2012. Instead, Plaintiffs' argue that the Individual Defendants were "deliberately reckless."  However, the Ninth Circuit has held that "deliberate recklessness" is "a form of intentional or knowing misconduct." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). To adequately allege deliberate recklessness, "the plaintiff must plead a highly unreasonable

Initials of Deputy Clerk _sr_

impossible to conclude that such allegations rest on anything more than hind-sight speculation." *Id.* (c*iting In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999)).  Considering plausible opposing inferences, as required by *Tellabs*, the inference of scienter is not "as compelling as any opposing inference."  *Tellabs*, 551 U.S. at 324. Moreover, the allegations do not satisfy the specificity requirement of Rule 9(b) or of the PSLRA.  The allegations of the Complaint neither identify what roles each Individual Defendant played in the alleged fraud nor allege facts giving rise to a strong inference of scienter on the part of each Individual Defendant in any context.  It is telling that Plaintiffs do not rely on confidential witnesses or specific internal reports to demonstrate what, if anything, the Individual Defendants knew or when they may have acquired that knowledge.

Plaintiffs' failure to allege specific facts with respect to the Individual Defendants' alleged knowledge is particularly problematic in this case because the misrepresentations and omissions relied on by Plaintiffs relate to an illegal scheme that Chan and his co-conspirators successfully concealed from them.  *See, e.g., Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) (holding that where misrepresentation claims related to illegal payments made by company's sales agents, such illegal activities did not give rise to an inference that the defendants were aware of them, but "to the contrary, the surreptitious nature of the transactions creates an equally strong inference that the payments would have deliberately been kept secret – even within the company").  In this case, Plaintiffs claim that scienter can be inferred because Sena, one of Chan's accomplices, told investors during a March 17, 2011 conference call that "nonrecurring, irregular" contracts would be vetted by the Board of Directors.  According to Plaintiffs, "the Board turned a blind eye to at least one non-recurring, irregular contract" for a credit facility that was improperly and illegally

---

omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*  Thus, "to plead reckless disregard, Plaintiffs must allege specific facts indicating a level of reckless disregard that strongly suggests actual intent."  *Dean v. China Agritech, Inc.*, 2001 WL 5148598, *4 (C.D. Cal. Oct. 27, 2011).  In this case, Plaintiffs have failed to plead any such facts. *See, e.g., New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (holding that a plaintiff could allege fraud by pleading "in your face facts that cry out"). Plaintiffs' reckless disregard argument is also unpersuasive because the Complaint itself acknowledges that in December 2011 ChinaCast, based on media reports related to other Chinese companies, voluntarily retained FTI to perform an independent analysis of its cash position even though "no question or concern has been raised by the Company's auditors, audit committee, or any other relevant professional related to the Company's cash balances."  FYI's analysis revealed that, as of June 30, 2011, ChinaCast had cash and cash equivalents totaling $132.1 million, or 98.5 percent of the total reported on its Form 10-Q for the same time period and that the remaining 1.5 percent discrepancy was attributable to the termination of one of ChinaCast's e-learning joint ventures.  Therefore, the fact that ChinaCast sought and received independent verification of its cash position just a few months before the end of the putative class period negates any inference that the Individual Defendants or ChinaCast were deliberately reckless or acted with the requisite intent to defraud shareholders.

Initials of Deputy Clerk _sr_

obtained by Chan and his co-conspirators, and which was not discovered by the Individual Defendants until after the end of the putative class period.  Moreover, there are no allegations that Chan and his co-conspirators disclosed this illegal transaction to the Board of Directors, or any of the Individual Defendants.

> **a.      Plaintiffs' Allegations That ChinaCast Lacked Effective Internal Controls Do Not Give Rise to a Strong Inference of Scienter.**

In their Complaint, Plaintiffs allege that ChinaCast's auditor, Deloitte, "warned the Board that serious internal control weaknesses existed."  However, "allegations that Defendants had deficient internal controls during the class period does not create a strong inference that Defendants knowingly [made] false or misleading statements."  *In re Loudeye Corp. Sec. Litig.*, 2007 WL 2404626, \*\*7-8 (W.D. Wash. Aug. 17, 2007) (holding that allegations "[t]hat the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim") (citation omitted).  Therefore, without additional facts, "a lack of internal controls generally does not suffice to show scienter."  *Communications Workers of America Plan for Employees' Pension and Death Benefits v. CSK Auto Corporation*, 2007 WL 2808652, \*8 (D. Ariz. Sept. 27, 2007); *In re Hypercom Corp. Securities Litigation*, 2006 WL 1836181, \*9 (D. Ariz. July 15, 2006) (holding that "the fact that Hypercom issued a press release recognizing a lack of effective internal controls, is not overly probative as to whether [defendant] intentionally misclassified the leases. Presumably every company that issues a financial restatement because of GAAP errors will cite as a reason lack of effective controls.").

In this case, Plaintiffs do not allege that Deloitte's advice was anything other than routine or that the warning was strong enough to warrant immediate action by the Individual Defendants.  In *In re American Apparel, Inc. Shareholder Litigation*, 855, F. Supp. 2d 1043, 1083 (C.D. Cal. 2012), the Court found that the plaintiffs failed to adequately allege scienter when the defendant corporation's auditor, which also happened to be Deloitte, actually resigned from its assignment with the company because Deloitte was "no longer willing to rely on management's representations" and because it "believed that management had withheld crucial financial information and made misrepresentations."  In their Complaint, Plaintiffs merely allege that Deloitte identified "inadequate resources" in ChinaCast's "finance team to meet the demands of rapidly expanded businesses which resulted in a delayed closing process" and a "lack of contemporaneous documentation of certain decisions made by the Board of Directors."  If Deloitte's actions were insufficient to give rise to an inference of scienter in *In re American Apparel* where Deloitte actually resigned as the result of questioning management's representations, the far more generic allegations pled by Plaintiffs in this action simply fail to give rise to an inference of scienter.[6]

---

[6] Plaintiffs also allege that ChinaCast failed to follow GAAP because its publicly reported financial statements failed to include any reference to the illegal acts by Chan and other employees.  However, "the mere publication of inaccurate accounting figures, or a failure to follow

**b.    The Individual Defendants' Corporate Positions Do Not Give Rise to a Strong Inference of Scienter**.

Plaintiffs also allege that a strong inference of scienter can be demonstrated by the Individual Defendants' high-level positions within ChinaCast.  However, the Complaint alleges no facts that the Individual Defendants knew about Chan's illegal activities as a result of or because of their high level positions.[7]  Instead, the Complaint merely identifies each of the Individual Defendants' positions and periods of service and then generically alleges that members of the Audit Committee, which includes several of the Individual Defendants, had various responsibilities, including oversight of financial reporting.  However, the positions of various Individual Defendants within ChinaCast is insufficient, without more, to create a strong inference of scienter.  *See, e.g., In re Oak Tech. Sec. Litig.*, 1997 WL 448168, at \*11 (N.D. Cal. Aug.1, 1997) (holding that allegations of knowledge based on positions within a company are "insufficient to establish [defendants'] liability for alleged misstatements"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (holding that "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants'

---

GAAP, without more, does not establish scienter."  *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (*quoting DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002)).  In this case, Plaintiffs have not offered any facts suggesting that any of the Individual Defendants were aware of any problems or issues with ChinaCast's financial reporting.  "Scienter requires more than a misapplication of accounting principles."  *Id.* at 1185-86 ("Defendants' GAAP violations just as likely support an inference that [defendants] acted with scienter as an inference of innocent and unknowing behavior").

[7]  In alleging that the Individual Defendants had knowledge of Chan's illegal activities, Plaintiffs rely heavily on a statement made by ChinaCast in July 2012, months after the end of the putative class period, that based on a review of bank statements from 2011 and 2012, it appeared there had been a series of "readily identifiable" inflows and outflows of cash related to Chan's illegal activities.  However, the Ninth Circuit has held that plaintiffs must include "detailed and specific allegations about management's exposure to factual information within the company."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  In this case, Plaintiffs fail to allege that any of the Individual Defendants received, had access to, or were even aware of the bank statements during the putative class period when Chan was committing his illegal acts.  *See, e.g., In re Daou Systems, Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005) (upholding a compliant based on "specific admissions from top executives that . . . they monitored portions of the company's database" that was the subject of the allegedly false statements).  Although not alleged in their Complaint, Plaintiffs argue in their Opposition that the Individual Defendants should have known about Chan's illegal activities based on the 2011 proxy litigation because during that proxy litigation Sherwood characterized efforts by Chan and others to acquire ChinaCast as an "improper process."  However, Plaintiffs fail to explain how this vague characterization should have placed the Individual Defendants on inquiry notice that Chan was looting ChinaCast.  In addition, as discussed above, the Individual Defendants conducted additional due diligence on ChinaCast's cash position for unrelated reasons in late 2011, but that investigation did not uncover the illegal activities at that time.

Initials of Deputy Clerk  sr

positions within the company") (citation omitted).

In addition, Plaintiff's bare allegations that various of the Individual Defendants were members of various committees, such as the audit committee, are insufficient to demonstrate a strong inference of scienter.  *See, e.g. In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 944, 956 (C.D. Cal. 2003) (dismissing complaint and finding that plaintiff had failed to allege scienter because "asserting that the men are members of Lockheed's executive committee, without describing the duties of the committee or how these defendants participated in it, does not demonstrate active involvement in day-to-day operations"). Therefore, Plaintiffs "must do more than allege that . . . key officers had the requisite knowledge by virtue of their 'hands on' positions; a ruling to the contrary would eliminate the necessity for specially pleading scienter as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position."  *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 844 (N.D. Cal.2000) (internal quotations and citation omitted).  Plaintiffs have failed to allege any specific facts that would tend to establish the Individual Defendants' knowledge of Chan's illegal activities or provide an adequate description of the activities and responsibilities of the Individual Defendants on the audit committee that might demonstrate deliberate recklessness in failing to discover Chan's illegal activity.

### c.      The Lack of Stock Sales Negates Any Inference of Scienter.

Even if Plaintiffs had alleged facts that might be sufficient to give rise to a strong inference of scienter, a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal.  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (holding that despite sales of $84 million in shares, the defendants still retained such a large percentage of their holdings – 92 percent – that an inference of scienter was functionally negated); *In re Silicon Graphics*, 183 F.3d at 987-88 (no scienter where despite over $13.8 million in stock sales, the defendants still retained over 90 percent of their holdings); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.Supp. 2d 1148, 1177-78 (C.D. Cal. 2007) ("while allegations of insider sales are not required in securities fraud cases, the lack of *any* tangible, personal benefit here further weighs against the Officer Defendants having scienter") (internal citations omitted).

In this case, assuming Plaintiffs had adequately pled scienter (which they have not), any inference of scienter is convincingly negated by the lack of stock sales by the Individual Defendants during the class period.  In fact, not a single Individual Defendant sold any shares of stock during the putative class period, notwithstanding Plaintiffs' claims that the Individual Defendants knew that ChinaCast's stock was artificially inflated during that time period.  In fact, one of the Individual Defendants, Sherwood, purchased more than 2.7 million shares during the putative class period.  Therefore, the substantial losses suffered by the Individual Defendants due to their failure to sell any stock during the class period sufficiently negates any inference of scienter that may have been raised by other allegations of the Complaint. *Tripp v. Indymac Financial Inc.*, 2007 WL 4591930, *4 (C.D. Cal. Nov. 29, 2007) (holding that "the Individual Defendants retained such a large percentage of their stock that an inference of

Initials of Deputy Clerk  _sr_

scienter is functionally negated"); *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992)
(holding that "if we were to conclude that the [defendants] meant to defraud investors, we
would have to believe that they did it for the sheer joy of it rather than for profit").

### 2.      Plaintiffs Failed to Sufficiently Allege Scienter Against ChinaCast

Plaintiffs' claims against ChinaCast must also be dismissed because Plaintiffs have
failed to plead scienter.  Although a corporation does not have a "mental state," for purposes
of determining scienter in the securities litigation context, "it is a well settled principle that
knowledge of officers and key employees of a corporation, obtained while acting in the course
of their employment and within the scope of their authority, is imputed to the corporation
itself."[8]  *In re Turbodyne Tech., Inc. Sec. Litig.*, 2000 WL 33961193, at *16 n. 115 (C.D. Cal.
Mar. 15, 2000) (*quoting Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 422 F.2d 1395,
1398 (8th Cir. 1970)).

However, under the adverse interest exception to the general rule of imputation, "the
knowledge and actions of employees acting adversely to the corporate employer cannot be
imputed to the corporation."  *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232
(D.N.J. 2000).  The adverse interest exception is derived from general principals of agency
law.  As the Court in *Cendant* held:

> The rule that knowledge or notice on the part of the agent is to be treated as
> notice to the principal is founded on the duty of the agent to communicate all
> material information to his principal, and the presumption that he has done so.
> But the legal presumptions ought to be logical inferences from the natural and
> usual conduct of men under the circumstances. But no agent who is acting in
> his own antagonistic interest, or who is about to commit a fraud by which his
> principal will be affected, does in fact inform the latter, and any conclusion
> drawn from a presumption that he has done so is contrary to all experience of
> human nature.

*Cendant*, 109 F. Supp. 2d at 232 (*quoting In re Jack Greenberg Court*, 212 B.R. 76, 84
(Bankr. E.D. Pa. 1997)).  Courts routinely invoke this principle in refusing to impute scienter
from the fraud of a rogue agent.  *See, e.g., Cendant*, 109 F. Supp. 2d at 233 (denying
summary judgment in securities fraud case because "no record has yet been developed as to
whether the fraud was conducted for [the employee's] personal benefit or that of the
corporation. The possibility of adverse interests between the guilty employees and the

---

[8]  In the Ninth Circuit, scienter may only be imputed from corporate officials who actually
made a challenged statement.  *See In re Apple Computer, Inc., Securities Litigation*, 243 F. Supp.
2d 1012, 1023-24 (N.D. Cal. 2002) (*citing Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424,
1435-36 (9th Cir. 1995)).

Initials of Deputy Clerk _sr_

corporation remains open"); *F.D.I.C. v. Lott*, 460 F.2d 82, 88 (5th Cir. 1972) (where bank president "fraudulently dealt with the bank in his own interest, he is deemed to have an adverse interest and the knowledge possessed by him [of his own fraudulent acts] in the transaction is not imputable to the bank"); *Alpern v. Utilicorp United, Inc.*, 1994 WL 682861, at *3 (W.D. Mo. Nov. 14, 1994) (declining to impute knowledge for purposes of Section 10(b) claim because "the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation") (*quoting Kaplan*, 9 F.3d at 407).

Under the adverse interest exception, dismissal of the corporation from a securities fraud action is warranted where the only corporate agent who may supply the requisite scienter was acting completely adversely to the Company's interests.  To determine whether to impute scienter from a corporate agent, Courts look "to whether [the] executive's fraud operates to benefit the company or whether the fraud is committed against the company." *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) (dismissing JPMorgan Chase from the action and holding that the plaintiffs' allegations that the CEO agreed to remain as CEO "for two years in exchange for a 14 percent premium against JPMC in the merger clearly did not benefit the company.  In fact, the allegations suggest that [the CEO] enriched himself at the expense of the corporate entity").

In this case, there is no allegation that Chan or his accomplices acted out of anything other than their own self-interest, or that their conduct in any way benefitted ChinaCast.  In fact, "Courts have typically found that an agent who uses his office to loot corporate assets has acted adversely to his principal."  *See In re National Century Finance Entertainment, Inc.*, 783 F.Supp. 2d 1003, 1016 (S.D. Ohio 2011); *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F.Supp. 2d 1210, 1219 (D. Nev. 2011) ("The 'classic example' of an agent acting adversely to his principal is where an agent embezzles from or loots his principal").  Therefore, any knowledge or intent on the part of Chan and his accomplices cannot be properly imputed to ChinaCast.  As a result, Plaintiffs have failed to allege scienter against ChinaCast.[9]

### B.    Violation of Section 20(a)

---

[9]  Plaintiffs argument that Chan and Sena's fraudulent intent may be imputed to ChinaCast because of the "sole actor" exception to the adverse interest rule is unpersuasive.  The sole actor exception applies when "the agent is the sole representative of the principal corporation," and, thus, applies in cases where "the wrongdoer was also the corporate principal's sole shareholder or when all the corporation's management participated in the wrongdoing," or there was otherwise no "innocent insider [that] could and would have exercised corporate authority to stop the fraud." *USACM*, 764 F. Supp. 2d at 1219-21.  Chan and Sena were clearly not ChinaCast's only shareholders or its sole representatives.  In addition, Plaintiffs do not allege, nor could they, that all of ChinaCast's management and shareholders were involved in Chan's illegal activities.  In fact, Plaintiffs, who are shareholders themselves, admit that they were unaware of the illegal activities, and they concede that the Individual Defendants had no knowledge of those activities.

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). As discussed above, Plaintiff has failed to state a claim for a primary violation of the securities law. Accordingly, Plaintiffs second claim for relief for violation of Section 20(a) must be dismissed as to each of the Individual Defendants.

## IV.     Conclusion

For all the foregoing reasons, Defendants' Motion is **GRANTED**. The Complaint is **DISMISSED without leave to amend** as to each of the Defendants, and this action is **DISMISSED with prejudice** as to each of the Defendants.[10]

IT IS SO ORDERED.

---

[10]  Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir.1996). In this case, Plaintiffs request leave to amend, but fail to offer any additional facts that could be alleged in an amended complaint. Such a failure is a strong indication that Plaintiffs have no additional facts to plead. *See, Silicon Graphics*, 183 F.3d at 991 (denying leave to amend where plaintiff failed to offer additional facts which might cure defects in complaint); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.1993) (same). In addition, Plaintiffs had the opportunity to plead additional facts from those alleged in their original complaint when they filed the consolidated complaint. Moreover, "dismissal with prejudice is necessary to promote the goal of the PSLRA, which is to 'raise the pleading standards to eliminate abusive securities litigation.'" *Id.* (*quoting Silicon Graphics*, 183 F.3d at 977). Accordingly, leave to amend is denied.

Initials of Deputy Clerk  sr