FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE CHINACAST EDUCATION CORPORATION SECURITIES LITIGATION, | No. 12-57232 |
| | D.C. No. 2:12-cv-04621-JFW-PLA |
| COSTA BRAVA PARTNERSHIP III LP, individually and on behalf of all other persons similarly situated, *Plaintiff-Appellant*, | OPINION |
| v. | |
| CHINACAST EDUCATION CORPORATION; NED SHERWOOD; STEPHEN MARKSCHEID; DEREK FENG; DANIEL TSEUNG, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
April 7, 2015—Pasadena, California

Filed October 23, 2015

2      IN RE CHINACAST EDUC. CORP. SEC. LITIG.

Before: Stephen Reinhardt, M. Margaret McKeown,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Securities Fraud

Reversing the dismissal of a securities fraud claim, the panel held that a CEO's fraud could be imputed to his corporate employer, even though his alleged embezzlement and misleading of investors through omissions and false statements were adverse to the company's interests.

Taking the allegations in the complaint as true, the panel agreed with the Third Circuit and concluded that the CEO's fraudulent misrepresentations—and, more specifically, his scienter or intent to defraud—could be imputed to the company because the CEO acted with apparent authority on behalf of the company, which placed him in a position of trust and confidence and controlled the level of oversight of his handling of the business.

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jeremy A. Lieberman (argued), Marc I Gross, and Emma Gilmore, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, New York, New York; Patrick V. Dahlstrom, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, Chicago, Illinois; Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, California; Philip Kim, The Rosen Law Firm, P.A., New York, New York, for Plaintiff-Appellant.

William G. McGuinness (argued), Israel David, and Adam M. Harris, Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

Under Rule 10b-5 of the Securities Exchange Act of 1934, "it is unlawful for 'any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011) (alteration in original) (quoting 17 CFR § 240.10b-5(b)). Both parties agree such deception occurred in this case: ChinaCast founder and CEO Ron Chan embezzled millions from his corporation and misled investors through omissions and false statements—textbook securities fraud. The sole question on appeal is a purely legal one and an issue of first impression in this circuit: Can Chan's fraud be imputed to ChinaCast, his corporate employer, even though Chan's looting of the corporate coffers was adverse to ChinaCast's interests? Taking the allegations in the

4       IN RE CHINACAST EDUC. CORP. SEC. LITIG.

complaint as true, we conclude that Chan's fraudulent misrepresentations—and, more specifically, his scienter or intent to defraud—can be imputed to ChinaCast. Significantly, imputation is proper because Chan acted with apparent authority on behalf of the corporation, which placed him in a position of trust and confidence and controlled the level of oversight of his handling of the business. We reverse the district court order dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

The facts are drawn from Costa Brava's complaint, which we accept as true for purposes of the Rule 12(b)(6) motion to dismiss. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). ChinaCast, founded in 1999, is a for-profit postsecondary education and e-learning services provider that sells distance learning and "multimedia education content" over the Internet and from three campuses in China. Before its abrupt downfall, ChinaCast boasted a market capitalization topping $200 million and was listed on the NASDAQ Global Select Market. ChinaCast's stock offerings in the United States in 2008 and 2009 generated $48 million in net proceeds.

In its March 2011 Form 10-K filing with the Securities and Exchange Commission ("SEC"), ChinaCast disclosed that its outside accounting firm Deloitte Tohmatsu CPA Ltd. (an affiliate of Deloitte & Touche LLP) ("Deloitte") had identified "serious internal control weaknesses" with respect to its financial oversight. The complaint alleged that, despite this "clear warning from Deloitte" regarding its lax financial oversight, the company and its board "turned a blind eye" to the problem.

Soon after, the complaint alleges, ChinaCast's founder and CEO, Ron Chan Tze Ngon ("Chan"), looted the company's coffers, including proceeds from the U.S. stock offerings. From June 2011 through April 2012, Chan "transferred" $120 million of corporate assets to outside accounts that were controlled by him and his allies. In addition, Chan permitted a company vice president to move $5.6 million in company funds to his son; "unlawfully transferred control" of two of ChinaCast's private colleges outside the company; and pledged $37 million in company assets to secure third-party loans unrelated to ChinaCast's business. These actions brought ChinaCast to financial ruin. The company cannot even afford its legal bills, according to its lawyers, who submitted a bare-bones brief on appeal and stated that "ChinaCast now unfortunately lacks the funds necessary to mount with full vigor the defense of this appeal."

In the midst of this fraud on multiple fronts, Chan and ChinaCast Chief Financial Officer Antonio Sena participated in a series of earnings calls and other communication with investors. During these calls, neither official disclosed the fraudulent activities taking place; instead, Chan emphasized the company's financial health and stability. For example, in a press release and conference call in fall 2011, Chan reassured investors that "no questions or concern[s] have ever been raised by the company's auditors or audit committee about our cash balances." Throughout 2011, Chan signed SEC filings on behalf of ChinaCast and never disclosed the $120 million in transfers and other fraudulent activities afoot.

In early 2012, ChinaCast's board discovered that Chan had attempted to interfere with an annual audit. The board removed him as chairman and CEO on March 26, 2012, and Sena resigned the next day. Beginning in April 2012,

6      IN RE CHINACAST EDUC. CORP. SEC. LITIG.

ChinaCast disclosed in a series of SEC forms that it had "uncovered questionable activities" and illegal conduct on the part of its senior officers.

In September 2012, a group of ChinaCast shareholders who bought stock between February 2011 and April 2012 ("the shareholders") brought this federal securities lawsuit, alleging that ChinaCast, Chan, Sena, and the company's independent directors violated Rule 10b-5 of the Securities Exchange Act of 1934.

The district court dismissed the complaint with prejudice under Rule 12(b)(6).[1]   With respect to the claim against ChinaCast, the court concluded that the shareholders failed to plead scienter—a bedrock requirement of Rule 10b-5. Although the actions of corporate agents usually are imputed to the corporate entity, the district court noted that under the "adverse interest exception," courts "refus[e] to impute scienter from the fraud of a rogue agent."   In this case, "there is no allegation that Chan or his accomplices acted out of anything other than their own self-interest, or that their conduct in any way benefitted ChinaCast."   Because Chan acted adversely to ChinaCast's interests, the district court concluded that Chan's scienter or intent to defraud could not be imputed to the corporation.   The shareholders therefore failed to allege scienter as against the corporation.

---

[1] The shareholders only appeal their claim against ChinaCast.  Chan and Sena reside outside the United States and, according to the shareholders, have evaded service of process.  The district court dismissed the claims against ChinaCast's independent directors because of a lack of scienter. The shareholders do not challenge that aspect of the ruling.

**ANALYSIS**

Federal securities law, embodied in the Securities Act of 1933 and the Securities Exchange Act of 1934, "create[s] an extensive scheme of civil liability," which encompasses not only SEC enforcement actions but a private right of action implied by the terms of § 10(b) of the 1934 Act.  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994).   These private suits serve the "animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *United States v. O'Hagan*, 521 U.S. 642, 658 (1997); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace.  They do so by deterring fraud, in part, through the availability of private securities fraud actions." (internal citation omitted)).  Such suits, however, are a double-edged sword, because they also can breed abusive litigation and "impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  To balance these competing forces, and "[a]s a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995," or PSLRA.  *Id.* The PSLRA, among other things, imposes "[e]xacting pleading requirements" that require "plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).  Plaintiffs must show a "strong inference" of scienter to survive a motion to dismiss.  15 U.S.C. § 78u-4(b)(2)(A).

8        IN RE CHINACAST EDUC. CORP. SEC. LITIG.

The scienter requirement is at the center of this appeal.[2] To be sure, CEO Chan possessed the requisite scienter, or intent to defraud. ChinaCast itself describes Chan's dealings as a "massive scheme . . . to loot the Company of its most valuable assets," which wrought "catastrophic" damage.[3] The question is whether Chan's scienter can be imputed to his corporate employer, ChinaCast. We review de novo this legal question that underlies the Rule 12(b)(6) dismissal. *N. Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009).

Section 10(b) and Rule 10b-5 can be violated by any "person," natural or legal, including corporations. *See* 15 U.S.C. § 78c(a)(9) (defining *person* under the Securities Exchange Act to include corporations); *see also Cent. Bank of Denver, N.A.*, 511 U.S. at 191 ("Any person or entity…may be liable as a primary violator under 10b-5."). Of course a corporation "can only act through its employees and agents" and can likewise only have scienter through them. *See Suez Equity Investors, L.P. v. Toronto-Dominion*

---

[2] "The elements of a private action under Rule 10b–5 are '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Janus*, 131 S. Ct. at 2301 n.3 (quoting *Stoneridge Inv. Part., LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

[3] Chan is a Chinese national who resides in China. In 2013, the SEC brought civil charges against Chan in the United States District Court for the Southern District of New York. Final judgment was entered against Chan, barring him from the securities industry and requiring him to pay $41.4 million in disgorgement, $6.65 million in interest, and a $750,000 civil penalty. *SEC v. Chan Tze Ngon*, No. 13-civ-6828 TPG, Dkt. No. 29 (S.D.N.Y. Jan. 16, 2015).

*Bank*, 250 F.3d 87, 101 (2d Cir. 2001). Because the Securities Exchange Act and accompanying regulations do not contain any explicit instructions on when an employee's acts and intent are to be imputed as those of the company, courts have looked to agency principles for guidance.[4] *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (en banc) (noting that the Exchange Act's explicit provision for

---

[4] There is, of course, no federal common law of agency that governs claims brought *under state law* in federal court. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83 (1994). We are called on here, however, to decide if ChinaCast is (alleged to be) a primary violator of § 10(b). That is we must define "the scope of conduct prohibited by § 10(b), [and thus] the text of the statute controls our decision." *Cent. Bank of Denver, N.A.*, 511 U.S. at 173. Accordingly this is a question of federal securities law, albeit one guided by (common law) agency principles. In fact, scienter itself, though an element of state common law fraud, is required only because of the way the Supreme Court read § 10(b). *See Ernst & Ernst*, 425 U.S. at 196–97.

Similarly, in *American Society of Mechanical Engineers*, the Supreme Court treated the issue we deal with here—imputation—as a question of interpreting the Sherman Act with guidance from agency principles, not a question of agency law in the state (New York) where the Society of Mechanical Engineers was incorporated. *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982); *see also Dark v. United States*, 641 F.2d 805 (9th Cir. 1981) (interpreting federal income tax law using agency principles); *but see Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (concluding imputation under the Exchange Act is a question of state law).

We also note that there does not appear to be a substantive difference between the general common law of agency on this question and that applied in Delaware, where ChinaCast was incorporated and whose law would presumably govern if state law applied. The parties have likewise addressed their briefing to general agency law rather than that of a particular state. We conclude that our analysis would not be any different if state law controlled.

secondary liability, §20(a), "was not intended to supplant the application of agency principles in securities cases") (internal quotation omitted).

Under the rule of imputation, it is "fundamental that an employer is liable for the torts of his employee committed while acting in the scope of his employment." *Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 432 (Del. 1965); *see also Belmont*, 708 F.3d at 494 ("[T]he imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority.") (internal citation omitted) (alteration in original). The rule exists for good reason: "Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them." Restatement (Third) of Agency § 5.03 cmt. b (2006).

In the context of Rule 10b-5, we have adopted the general rule of imputation and held that a corporation is responsible for a corporate officer's fraud committed "within the scope of his employment" or "for a misleading statement made by an employee or other agent who has actual or apparent authority." *Hollinger*, 914 F.2d at 1577 n.28. Other courts follow the same principles, even after the advent of the PSLRA and its strict focus on scienter: "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003) (collecting cases); *see also Makor Issues & Rights Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("The doctrines of respondeat superior and apparent authority remain applicable to suits for securities

fraud."); *Snowstorm Acquisition Corp. v. Tecumseh Prod. Co.*, 739 F. Supp. 2d 686, 706 (D. Del. 2010) (same with respect to Delaware corporation).

In the face of these well-established parameters, ChinaCast does not dispute that Chan acted within the scope of his apparent authority.   Nevertheless, the corporation argues that the ordinary rule of imputation is inapposite because of the common law's so-called "adverse interest exception."  Under that exception, a rogue agent's actions or knowledge are "not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."   Restatement (Third) of Agency § 5.04 (2006); *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1205 (Del. 2015) ("[T]he adverse interest doctrine may prevent a court from imputing knowledge of wrongdoing to an employer when the employee has totally abandoned the employer's interests, such as by stealing from it or defrauding it.").

So far, so good for ChinaCast—unquestionably Chan lined his own pockets at the expense of ChinaCast's interests. But herein lies the rub: ChinaCast's formulation ignores that the adverse interest rule doesn't apply in every instance where there is a faithless fraudster within the corporate ranks. Specifically, the very same Restatement provision that sets out the adverse interest exception also provides: "Nevertheless, notice is imputed . . . when necessary to protect the rights of a third party who dealt with the principal in good faith."   Restatement (Third) of Agency § 504 (2006); *see also Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1091 n.13 (Utah 2003) ("Although typically an agent's knowledge will not be imputed to its principal when an agent is involved in

fraud or other adverse dealings, an exception exists for innocent third parties."); *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 891 (Del. Ch. 2009) *aff'd sub. nom. Teacher's Ret. Sys. of Louisiana v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (even when the adverse interest exception applies, "the corporation…[remains] responsible to innocent third parties and the polity for any offense to them"); *cf.* Restatement (Second) of Agency § 262 & cmt. a (1958) (explaining how apparent authority protects third-party reliance).  In other words, there is an exception to the exception: the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority.

The interplay between these principles has been explained as follows:

> The starting point is that all information known by the agent, at least when received within the scope of authority, is deemed known by the principal.  But this is not so if the agent is acting contrary to the principal's interests—the so-called "adverse interest" exception.  In turn, the adverse interest exception itself has an exception: the principal is charged with even the faithless agent's knowledge when an innocent third-party relies on representations made with apparent authority.

Donald C. Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin. L. Rev. 1187, 1214 (2003).

In short, parsing the common law in context—looking to both the adverse interest exception and its imbedded caveats that are essential to cabining its scope—compels the conclusion that Chan's scienter can be imputed to the corporation in these circumstances. Restatement (Third) of Agency § 5.04 cmt. b (2006) (noting that adverse interest rule and its exceptions work together "as a whole" so that the "doctrine reflects a balance among factors that, if pressed in isolation to their respective extremes, would lead to divergent outcomes"). The complaint alleges that third-party shareholders understandably relied on Chan's representations, which were made with the imprimatur of the corporation that selected him to speak on its behalf and sign SEC filings.

Although a question of first impression in this circuit, case law from other courts confirms that imputation is proper even in the face of Chan's double dealing. The Third Circuit recently confronted the same issue in the case of an investment adviser who perpetrated a Ponzi scheme, diverting $20 million of client funds to finance his lavish lifestyle. *Belmont*, 708 F.3d at 479. Defrauded clients sued the corporate employer, MB Investment Partners, Inc., for fraud under Rule 10b-5. *Id.* at 494. Just like ChinaCast, the corporation invoked the adverse interest exception. The Third Circuit rejected that argument and held that imputation is appropriate when an employee acts within his actual or apparent authority. Significantly, the court held that "a swindler may still act with apparent authority, even if he is acting for his own benefit." *Id.* at 496 (citation omitted). The court noted that the "underlying purpose of imputation" is "fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *Id.* Hence, when a corporate officer commits wrongdoing, the "principal who has placed the agent in the position of trust

and confidence should suffer, rather than an innocent stranger." *Id.* at 494–95 (internal citation omitted); *see id.* at 497.

In the same vein, in the federal antitrust context, the Supreme Court endorsed the identical principle of imputation: "[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agents acts with apparent authority." *Mech. Eng'rs*, 456 U.S. at 566. According to the Court, imputation and the corresponding threat of civil liability give an employer greater incentive to "see to it that [its] agents abide by the law" and "take systematic steps" to prevent misconduct. *Id.* at 572–73 (internal citation omitted) (alteration in original). Although *Mechanical Engineers* is an antitrust case, its reasoning is not limited to that context. The Supreme Court explained that the "[a]pparent authority theory has long been the settled rule in the federal system" and cited *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349 (1929), a railroad tort case. *Mech. Eng'rs*, 456 U.S. at 567–68. Significantly, the Supreme Court cited two Rule 10b-5 securities cases, among others, in noting that "[i]n a wide variety of areas, the federal courts, like this court in Gleason, have imposed liability upon principals for the misdeeds of agents acting with apparent authority." *Id.* at 568.

ChinaCast and the district court cite to several district court decisions that invoke the adverse interest exception. *See In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493, 522 (W.D. Penn. 2002); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232–34 (D. N.J. 2000). These cases are hardly illuminating, however, because they do not address the relationship between the adverse interest exception and third-party reliance and apparent authority. In contrast, other

district courts have invoked apparent authority to override the adverse intent exception, including a Rule 10b-5 case involving Dennis Kozlowski's infamous looting of Tyco. *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, No. MDL 02-1335-B, 02-266-B, at \*6 (D. N.H. Oct. 14, 2004) (holding that the "adverse interest exception is inapplicable when a corporate officer or director makes a material misstatement or omission to an innocent third party while acting with the apparent authority of the corporation for whom he works"); *see also Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 944, 947 (E.D. Wis. 2011) (holding corporation liable for its vice president's embezzlement of more than \$30 million from the company to purchase designer clothing, jewelry, furs, and other items even though she "committ[ed] fraud against the company rather than on behalf of it" because she acted with apparent authority by signing the corporation's SEC filings).

In the circumstances of this case, imputation also comports with the public policy goals of both securities and agency law—namely, fair risk allocation and ensuring close and careful oversight of high-ranking corporate officials to deter securities fraud. *See Belmont*, 703 F.3d at 494–95 (noting that the "principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger" (internal citation omitted)); *see also Broudo*, 544 U.S. at 345; *State Farm Fire and Cas. Co. v. Sevier*, 537 P.2d 88, 96 (Or. 1975) ("[O]ne who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons.").

According to the complaint, which governs our analysis at this early procedural stage, ChinaCast received an audit from Deloitte in 2011 detailing "material internal control

weaknesses."  Yet the corporation and its board "turned a blind eye" and failed to take significant action or heighten oversight.  Had they done so, they may have prevented much of the decimation of ChinaCast's bottom line and share value. Indeed, the $120 million in illicit withdrawals began several months after the Deloitte report was issued.  What's more, Chan was hardly a random corporate bureaucrat or mid-level manager.  He was ChinaCast's founder and CEO, the one person on whom the board undoubtedly should have kept close tabs. *See In re Fin. Mgmt.*, 784 F.3d 29, 31–32 (1st Cir. 1986) (noting courts have applied apparent authority rule against corporations "particularly when the person making the misrepresentation is an important corporate official"). Permitting imputation under these circumstances encourages appropriate corporate oversight.

According to the complaint, both Chan and Sena knowingly misrepresented ChinaCast's financial condition. Because we conclude that their scienter can be imputed to ChinaCast for those material misrepresentation or omissions made within the scope of their apparent authority, the shareholders pled sufficient allegations to support imputation and survive the pleading requirements of the PSLRA.  Of course, whether these allegations will materialize as admissible facts remains to be seen.

In closing, we note that at the pleading stage, a key inquiry in § 10(b) and Rule 10b-5 cases is whether the complaint sufficiently alleges scienter attributable to the corporation. A threshold question is whether the pleadings

support application of the adverse interest rule at all.[5]
Assuming a well-pled complaint, we recognize that, as a
practical matter, having a clean hands plaintiff eliminates the
adverse interest exception in fraud on the market suits
because a bona fide plaintiff will always be an innocent third
party. The gymnastic exercise of imposing a general rule of
imputation followed by analyzing the applicability of the
exception to the exception becomes unnecessary. Of course,
as the litigation proceeds, whether the plaintiff is an innocent
third party and whether the presumption of reliance is
rebutted[6] remain open questions. This approach, which takes
an appropriately narrow view of the adverse interest
exception, is consistent with the purpose of the securities laws
to deter fraud and promote confidence in the securities
markets.

The district court's order dismissing this case with
prejudice under Rule 12(b)(6) is **REVERSED**.

---

[5] *In re Petrobras Sec. Litig.*, No. 14-CV-9662 JSR, 2015 WL 4557364,
at \*12 (S.D.N.Y. July 30, 2015) (rejecting the adverse interest exception
defense because "the allegations…do not conclusively establish that the
company received no benefit from the Corrupt Executives' actions").

[6] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408
(2014) (reaffirming in a fraud on the market suit "the rebuttable
presumption of reliance, rather than providing direct reliance on a
misrepresentation").